## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **TAISUKE OHIRA,** | |
| *Plaintiff,* | **Civil Action No._____** |
| v. | **COMPLAINT** |
| **TRUSTEES OF BOSTON UNIVERSITY,** | **JURY TRIAL DEMANDED** |
| *Defendant.* | |

Plaintiff Taisuke Ohira, (hereinafter "Ohira" or "Dr. Ohira" or "Plaintiff"), by and through his attorneys Nesenoff & Miltenberg, LLP, as and for his Complaint against Defendant Trustees of Boston University, respectfully alleges as follows:

### THE NATURE OF THE ACTION

1.      This case arises out of the actions of Defendant Trustees of Boston University, as well as its agents and employees, in connection with the investigation and adjudication of allegations brought by students of BU against Plaintiff Dr. Ohira, a former Clinical Assistant Professor in the Periodontology Department at BU's Henry M. Goldman School of Dental Medicine.

2.      Despite the clear evidence of collusion among the reporting parties, BU conducted investigations marred by procedural defects, and replete with instances of biased and discriminatory actions, which resulted in a final sanction of termination of Plaintiff's employment from the University.

1

3.      As a result of the University's actions, Plaintiff has suffered substantial damages including lost career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

4.      Plaintiff therefore brings this action against Defendant, for violations arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B ("Chapter 151B"), and state-law claims for breach of contract and denial of basic fairness.

## THE PARTIES

5.      At all relevant times, Dr. Ohira was a resident of the State of Massachusetts and is currently a resident of the State of Massachusetts.

6.      At all relevant times, Plaintiff was an "employee" of Defendant Boston University ("BU" or the "University") as that term is defined by Title VII of the Civil Rights Act of 1964 ("Title VII") and the Massachusetts Fair Employment Practices Act ("FEPA"), Mass. Gen. Laws Ann. Ch. 151B.

7.      Upon information and belief, Boston University was and still is a private university with its principal place of business located at One Silber Way, Boston, Massachusetts 02215.

8.      At all relevant times, the Defendant was Plaintiff's "employer" as defined by Title VII and Mass. Gen. Laws Ann. Ch. 151B.

9.      Upon information and belief, at all relevant times, the University employs at least six employees, as required by Mass. Gen. Laws Ann. Ch. 151B.

## JURISDICTION AND VENUE

10.      This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because the federal law claims arises under the Constitution and statutes of the

United States, and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

11.     This Court has personal jurisdiction over the Defendants on the grounds that they conduct business within the Commonwealth of Massachusetts.

12.     At all relevant times, the actions and events discussed herein transpired within the Commonwealth of Massachusetts.

13.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Defendant BU is considered to reside in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.     On February 22, 2023, Plaintiff dual filed an administrative Charge of Discrimination with both the Massachusetts Commission against Discrimination ("MCAD"), MCAD Charge No. 23BEM00623, and the United States Equal Employment Opportunity Commission ("EEOC"),  EEOC Charge No. 16C-2023-01028, against Defendant, alleging discrimination on the basis of sex, race and/or national origin, in violation of the Massachusetts Fair Employment Practices Act, Massachusetts General Laws ch. 151B ("Chapter 151B"), and Title VII.

15.     Thereafter, in accordance with M.G.L. § 151b, § 9, Plaintiff elected to withdraw his complaint from both the MCAD and the EEOC and to commence an action in this Court.

16.     On April 25, 2025, Plaintiff received notice from the MCAD that his complaint had been dismissed after being withdrawn pursuant to 804 CMR 1.08(1)(b)(2020).

17.     Accordingly, Plaintiff has timely and properly exhausted his administrative remedies and satisfied all pre-conditions to bring the within action.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.    Dr. Ohira's Career and Responsibilities at BU

18.    Dr. Ohira earned his dental degree and PhD in Japan, before arriving in the United States in 2001.

19.    Though he has been working and living in the United States since that time, his proficiency in English remains minimal, especially in verbal communication.

20.    He worked as a dental researcher in basic science at Boston University, Harvard University, and Tufts University for over ten years, before entering the Master of Science in Dentistry/Certificate of Advanced Graduate Study ("MSD/CAGS") program at BU in 2014.

21.    As his research skills were highly regarded, when he graduated from the MSD/CAGS program in 2017, he was asked to join the Department of Periodontology at BU as a Clinical Assistant Professor, in the lab of Dr. Serge Dibart, Chair of the Periodontology Department at BU's Henry M. Goldman School of Dental Medicine.

22.    At the time, Dr. Dibart was interested in starting new research programs which required additional faculty members to supervise students. Dr. Ohira was one of the few who had the necessary credentials and a deep understanding of basic science research to be able to both conduct and teach clinical-related basis research projects.

23.    He soon thereafter began mentoring students five days per week.

24.    As a faculty member in the Dibart Lab (the "Lab'), one of Dr. Ohira's primary responsibilities was to guide students through their research projects, instilling in them an appreciation and understanding of basic scientific research and its challenges.

25.     The students' research activities in the Lab involved conducting experiments using animals and cells with a long-term goal of finding cures for periodontal diseases. There were no actual dental patients involved in the Lab.

26.     In January of 2018, Dr. Ohira received the title of Clinical Assistant Professor.

27.     From 2020 forward, Dr. Ohira would typically mentor eight or nine students at one time, despite the typical research mentor only being assigned four students.

28.     Although due in part to faculty to student ratios, this was also indicative of Dr. Ohira's ability to oversee more students than his fellow faculty members.

29.     Dr. Ohira was invested in his students' success, and often went above and beyond the usual responsibilities of a research mentor. He strived to maintain a one-on-one relationship with each student, he would review, correct, and guide students through each step of their project, and he even went so far as to write portions of his students' theses to ensure that they would graduate on time.

30.     In the summer of 2019, Dr. Ohira took on the role of lab manager in addition to being a research mentor. In this role, he was responsible for the general upkeep of the lab, lab equipment, and supplies, organization discussions with the facilities and Department Chair, and moving the lab to a different building in 2020 and again in 2021. As of 2020, additional responsibilities also included preparing Covid-19 documents and making arrangements for personal protective equipment.[1]

31.     Unsurprisingly, the rise of Covid-19 presented unique challenges for working in the lab environment. Dr. Ohira practiced hyper-vigilant sanitation protocols in order to keep the

---

[1] Plaintiff was responsible for ensuring the lab members wore appropriate protective gear prior to the Covid-19 pandemic, for instance, to protect from spilled chemicals. In 2020, he also became responsible for monitoring the use of additional personal protective equipment ("PPE"), due to the Covid-19 pandemic

lab open. Although students were not as attentive to the protocols as he was, and did not appreciate his frequent reminders of protocol, Dr. Ohira continued to act with vigilance to keep the lab open so he could meet his obligations to his students.

32.    While mentoring students in the Lab, Dr. Ohira was often the only person permitted to use some of the equipment, such as the microscopes. Accordingly, he would adjust and operate the equipment while the students observed. This equipment was kept in small rooms, where there was not a lot of space. Due to the nature of the microscopic material they worked with in the Lab, Dr. Ohira often had to be in close proximity with students to show them how to use the software on the computers attached to the equipment correctly.

33.    However, at no time did he ever engage in any type of conduct or physical interaction that could be considered a violation of the University's conduct policies.

34.    Dr. Ohira is a professional, devoted to his research and career, and would simply never engage in any conduct that could potentially jeopardize his lifetime of hard work or the trajectory of his career.

35.    In fact, in a conversation held in June of 2021, Dr. Dibart verbally informed Dr. Ohira that he would receive a 4% raise beginning with his July of 2021 paycheck. Further, Dr. Dibart recognized that Dr. Ohira should have been earning an even higher salary, given the additional responsibilities and roles that he had undertaken. Dr. Dibart explained to Dr. Ohira that, to get such a raise approved by the University, he would need to promote Dr. Ohira, which he anticipated would occur in January of 2022.

36.    Of course, this promotion never occurred, given Dr. Ohira was wrongly found responsible for policy violations and improperly terminated.

II.    **Boston University's Discrimination, Harassment, and Sexual Misconduct Policies and Procedure**

    *A.  Boston University's Equal Opportunity/Affirmative Action Policy*

37.    During the relevant timeframe, Boston University's Equal Opportunity/Affirmative Action Policy (the "Equal Opportunity Policy") applied to all complaints of unlawful discrimination or harassment, except those alleging any form of sexual misconduct, and those brought by students on the basis of disability.[2]

38.    The Equal Opportunity Policy "prohibits discrimination against any individual on the basis of race, color, natural or protective hairstyle, religion, sex, age, national origin, physical or mental disability, sexual orientation, gender identity, genetic information, military service, pregnancy or pregnancy-related condition, or because of marital, parental, or veteran status."

39.    The Equal Opportunity Policy applies to "all rights, privileges, programs, and activities, including admissions, financial assistance, educational and athletic programs, housing, employment, compensation, employee benefits, and the providing of, or access to, University services or facilities."

40.    The Equal Opportunity Policy further provided that, "Boston University recognizes that non-discrimination does not ensure that equal opportunity is a reality. Accordingly, the University will continue to take affirmative action to achieve equal opportunity through recruitment, outreach, and internal reviews of policies and practices."

41.    The Executive Director of Equal Opportunity is responsible for the coordination and implementation of the Equal Opportunity Policy.

    *B.  Boston University's Complaint Procedures in Cases of Alleged Unlawful Discrimination or Harassment*

---

[2] All references herein to the applicable University policies refer to the versions of the policies in effect at the time of the relevant events.

42.    Boston University's Complaint Procedures in Cases of Alleged Unlawful Discrimination and Harassment (the "Equal Opportunity Procedure") applies to all complaints of unlawful discrimination or harassment, other than those alleging any form of sexual misconduct, and those brought by students on the basis of a disability.

43.    The Equal Opportunity Procedure prohibits discrimination on the basis of race, color, creed, religion, ethnic origin, age, sex, disability, sexual orientation, gender identity, or any other unlawful basis.

44.    The Equal Opportunity Procedure works to ensure that "non-discrimination is a reality at Boston University and that no person in the University community is subjected to such unlawful conduct."

45.    According to the Equal Opportunity Procedure, "any employee, student, or applicant for employment or admission who believes that he or she has been subjected to any form of unlawful discrimination may make a complaint."

46.    The Equal Opportunity Procedure requires a fair and impartial investigation of all complaints, "with due regard for the rights of all parties."

47.    The Equal Opportunity Procedure prohibits retaliation against any person who has either made a complaint or who has cooperated in the investigation of a complaint.

48.    All complaints of unlawful discrimination or harassment are subject to the Equal Opportunity Procedure, except "(1) those alleging any form of sexual misconduct, and (2) those brought by students on the basis of disability".

49.    The Equal Opportunity Procedure specifies that "students may initiate a complaint by speaking to the Dean's office of the student's School or College or by contacting the Equal

Opportunity Office or the Dean of Students Office. Students living in University residences may also speak to a member of the Residence Life."

50.    According to the Equal Opportunity Procedure, "faculty or staff may initiate a complaint by contacting the Equal Opportunity Office or Human Resources. Employees in academic units may also initiate a complaint with the Dean's office of the applicable School or College. Employees covered by a collective bargaining agreement may have additional options under that agreement for addressing complaints."

51.    An investigation will follow a complaint conducted by "the designated office or individual with the appropriate expertise and jurisdiction to do so. . . In any particular case, the University Provost may designate the office or individual to investigate a complaint."

52.    Any investigation may involve "meeting with the parties, interviewing witnesses, requesting written statements from the parties, informing the person whose actions are the subject of the complaint of the allegations and/or providing to that person a copy of the complainant's statement, and/or making any other appropriate inquiries. Before any adverse determination is made, the individual whose actions are the subject of the complaint will be informed as to the nature of the complaint, and will have an opportunity to respond."

53.    The Equal Opportunity Procedure requires investigations to be completed promptly, so a decision can be rendered within sixty (60) calendar days of the receipt of the complaint. If the investigation is not completed within sixty days, the complainant will be informed of the status of the investigation, per the Equal Opportunity Procedure.

54.    The complainant may submit an appeal if they believe that the resolution of the complaint has not rectified the situation. "In cases involving complaints against a faculty member, the appeal should be filed with the Executive Director of Equal Opportunity, who will consult with

either the Dean of the School or College in which the faculty member is appointed (if the Dean did not make the decision being appealed) or the University Provost to determine the appropriate officer of the University to whom the appeal should be directed."

55.    The accused party may appeal adverse action taken as a result of the complaint. The Equal Opportunity Procedure states that in the case of a complaint being made against a faculty member, the grievance procedure is outlined in the Faculty Handbook.

56.    However, the Faculty Handbook refers faculty members back to the Equal Opportunity Procedure, stating: "Please note that all allegations of unlawful discrimination or harassment, except those arising out of the tenure and promotion process for faculty with unmodified titles, are to be processed under the University's policy regarding "Alleged Unlawful Discrimination or Harassment," rather than through the Grievance Procedure described here."

C.    *Boston University's Sexual Misconduct/Title IX Policy*

57.    Boston University's Sexual Misconduct/Title IX Policy was revised in or about 2020, with the new Sexual Misconduct Policy taking effect as of August 14, 2020.

58.    The new Sexual Misconduct Policy and its three corresponding complaint resolution procedures apply to conduct occurring on or after August 14, 2020, while conduct occurring prior to August 13, 2020 is resolved through the University's Sexual Misconduct/Title IX Policy and its corresponding complaint procedures.

59.    The Title IX Policy prohibits "all forms of sexual misconduct, including sexual assault and sexual harassment."

60.    The Title IX Policy states that "the University complies with all state and federal discrimination laws, including Title IX of the Higher Education Amendments of 1972, the federal law that prohibits discrimination on the basis of sex in education programs and activities."

10

61.     The Title IX Policy defines sexual misconduct as "a broad range of conduct focused on sex and/or gender that may or may not be sexual in nature."

62.     The Title IX Policy defines sexual assault as "actual or attempted sexual contact with another person without that person's consent." Examples of sexual assault include "intentional touching of another person's intimate parts without that person's consent; or other intentional sexual contact with another person without that person's consent; or coercing, forcing, or attempting to coerce or force a person to touch another person's intimate parts without that person's consent; or rape."

63.     The Title IX Policy defines sexual harassment as "unwelcome conduct of a sexual nature that has the effect of creating a hostile or stressful living, learning, or working environment, or whenever toleration of such conduct or rejection of it is the basis for an academic or employment decision affecting an individual. Conduct is considered 'unwelcome' if the person did not request or invite it and considered the conduct to be undesirable or offensive. Sexual harassment includes any conduct or incident that is sufficiently serious that it is likely to limit or deny a student's ability to participate in or benefit from the University's educational programs or a faculty or staff member's ability to work, which may include a single incident of sexual assault or other serious sexual misconduct."

64.     The Title IX Policy specifies that "in determining whether sex-based harassment has created a hostile environment, the University considers the conduct in question from both a subjective and objective perspective. It will be necessary, but not enough, that the conduct was unwelcome to the student who was harassed. But the University will also need to find that a reasonable person in the student's position would have perceived the conduct as undesirable or offensive in order for that conduct to create or contribute to a hostile environment."

11

65.    The Title IX Policy applies to "all community members, including students, faculty, staff, affiliates, visitors, applicants for admission or employment, and independent contractors."

66.    The Title IX Policy encourages prompt reporting. Students may report sexual misconduct to the Dean of Students, the Office of Judicial Affairs, the Title IX Coordinator, a Deputy Title IX Coordinator, a supervisor, a dean, or a department head. If one of these individuals receives a report, the University must begin an investigation.

67.    Students may choose to report misconduct to a faculty member, coach, or resident adviser, however, many faculty and staff are "responsible employees." Responsible employees include supervisors and officials with significant responsibility for student and campus activities and are required to report any incidents to the Title IX Coordinator.

68.    The Title IX Policy states that before a student discloses an incident, "University faculty and staff will try to ensure that the student understands the employee's reporting obligations – and, if the student wishes to maintain confidentiality, direct the student to confidential resources."

69.    When complaints are made to non-confidential resources and the complainant requests confidentiality and no subsequent investigation, the Title IX Coordinator and a small number of University administrators, will evaluate the request. If any of the following factors are met the University may investigate the complaint and subsequently sanction the respondent:

    a.    The respondent is likely to commit additional acts of sexual or other violence, such as;

        i.    There have been other sexual misconduct complaints about the same respondent;

        ii.    The respondent has a history of arrests or records from a prior school indicating a history of violence;

       iii.    The respondent threatened further sexual misconduct or other violence against the complainant or others;

       iv.    The sexual misconduct was committed by multiple respondents;

    b.   The sexual misconduct was perpetrated with a weapon;

    c.   The complainant is a minor;

    d.   The respondent is a Boston University employee;

    e.   The University possess other means to investigate the sexual misconduct (e.g., security cameras or personnel, physical evidence);

    f.   The complainant's report reveals a pattern or perpetration (e.g., via illicit use of drugs or alcohol) at a given location or by a particular person or group.

70.    If the University complies with a request for confidentiality or decision not to participate in an investigation, the sanctions and action against the respondent are limited.

71.    The Title IX Policy offers interim measures and support to those alleging to have suffered sexual misconduct. "Interim measures are available to provide for the safety of the complainant and the campus community while the University is investigating an allegation of sexual misconduct."

72.    The Title IX Policy states, "upon the receipt of a report of sexual misconduct, and until any investigation into the report has been completed, the University will provide reasonable protective measures and interim support to provide a safe educational and work environment and to prevent additional acts of sexual misconduct, even when there is no specific request for protective action."

73.    The Title IX Policy has no time limit on reporting, however, "the University's ability to investigate and respond effectively may be reduced with the passage of time."

74.    The Title IX Policy prohibits retaliation and intimidation against any person because they reported an incident of sexual misconduct or they were involved in the University's response. "BU will take strong disciplinary action in response to any retaliation or intimidation, and will pursue such discipline through the applicable student conduct policy or other disciplinary process and follow the applicable time frames within such policies or processes."

75.    "The Title IX Coordinator oversees the initial response and assessment of reports of sexual misconduct through the University's sexual misconduct resolution procedures. . . Each process is guided by the same principles of fairness and respect for all parties."

D. *Boston University's Previous Procedures for the Resolution of Sexual Misconduct Complaints Against Faculty, Staff, Affiliates, and Non-Affiliates*

76.    Boston University's Procedures for the Resolution of Sexual Misconduct Complaints Against Faculty, Staff, Affiliates, and Non-Affiliates (the "Old Title IX Procedure") applies to conduct that occurred on or before August 13, 2020.

77.    The Old Title IX Procedure applies to all complaints of sexual misconduct against Boston University faculty and staff members, affiliates, and non-affiliates.

78.    The Old Title IX Procedure states that it is "designed to be accessible, prompt, fair and impartial."

79.    The Procedure outlines the following rights for both the complainant and the respondent:

a.    To be treated with respect, dignity, and sensitivity;
b.    To receive appropriate support from the University;
c.    Privacy to the extent possible, consistent with applicable law and University policy;
d.    Information about the University's Sexual Misconduct/Title IX Policy;
e.    A prompt and thorough investigation of the allegations;
f.    Notification, in writing, of the case resolution, including the outcome of any appeals;
g.    To report the incident to law enforcement (including the Boston University Police or the police department in the jurisdiction in which the sexual misconduct occurred) at any time.

80.    The Old Title IX Procedure assures that "[t]he complainant and respondent may each choose and be accompanied to any meeting or hearing related to these Procedures by an Adviser, who may provide support during such meeting or hearing."

14

81.     Under the Old Title IX Procedure, a complainant may decline to participate in the investigative or resolution process, but the University may continue without their participation.

82.     The Old Title IX Procedure provides that "[t]he University will seek to resolve every report of sexual misconduct within sixty (60) calendar days of the start of an investigation, not counting any appeals. . . The University may extend any time frame for good cause, with a written explanation to the complainant and respondent."

83.     The Old Title IX Procedure prohibits retaliation and any person who retaliates against a person for reporting sexual misconduct, filing a complaint, or participating in an investigation is subject to disciplinary action.

84.     Further, the Old Title IX Procedure states: "[t]he Title IX Coordinator, or designee, will give the complainant and respondent, respectively, an explanation of their rights and options, and as appropriate, any available accommodations, as soon as possible after the complaint is reported. The Equal Opportunity Office will also ensure that both the complainant and respondent are updated throughout the investigative process, including with timely notice of meetings where either the complainant's or the respondent's presence may be required."

85.     Additionally, both parties will receive written notice of the investigation results simultaneously, and the complainant will be made aware of any sanctions imposed on the respondent.

86.     The Old Title IX Procedure states that any person who believes they have experienced sexual misconduct may file a complaint as well as any person who has information that a University faculty or staff member, affiliate, or non-affiliate may have committed sexual misconduct.

87.     Once the complaint is filed, the Title IX Coordinator will review the allegations and determine the necessity and scope of any interim measures to prevent further acts of misconduct. "An individual's failure to comply with restrictions imposed by interim measures is a violation of University Policy and a basis for disciplinary action, up to and including termination of employment."

88.     The Title IX Coordinator will designate an Investigator, typically a member of the Equal Opportunity Office, specifically trained in sexual misconduct investigations to conduct a prompt, thorough, and fair investigation of any sexual misconduct complaint.

89.     The investigation may involve one or more meetings with each party, interviewing witnesses, reviewing other relevant evidence, requesting written statements from the parties, informing the respondent of the allegations and/or providing the respondent with a copy of the complainant's statement. "Before any adverse determination is made, the respondent will be informed as to the nature of the complaint, and will have the opportunity to respond."

90.     The relevant standard of proof is by preponderance of the evidence, which the Old Title IX Procedure defines as "whether the evidence gathered and information provided during the investigation supports a finding that it is more likely than not that the respondent violated the Sexual Misconduct/Title IX Policy."

91.     At the end of the investigation, the Investigator will prepare an investigative report, summarizing and analyzing the relevant facts determined throughout the investigation, and making a determination as to whether the respondent violated the Title IX Policy.

92.     The investigative report will then be provided to the Dean of the respondent's School or College who, with the approval of the provost, will make a final determination as to the

appropriate sanction for a violation. Before any disciplinary action, the respondent shall be afforded an appeal.

93.     The respondent has the right to appeal the investigative determination and the imposed sanction. An appeal is available only on the following grounds: (i) insufficient evidence to support the investigator's findings; (ii) the disciplinary sanction imposed is disproportionate to the violation of the Title IX Policy; (iii) the discovery of new, relevant evidence, that was unavailable to the appealing party during the investigation that could reasonably affect the outcome of the case; or (iv) prejudicial bias on the part of the Investigator.

   E.   *Boston University's Updated Procedures for the Resolution of Title IX Sexual Misconduct Complaints Against Students, Faculty, Staff, Affiliates, and Non-Affiliates*

94.     Boston University's Procedures for the Resolution of Title IX Sexual Misconduct Complaints Against Students, Faculty, Staff, Affiliates, and Non-Affiliates (the "New Title IX Procedure") applies to conduct that occurred on or after August 14, 2020.

95.     The New Title IX Procedure is "designed to be accessible, prompt, equitable, and impartial." The New Procedure allows the complainant and respondent the following rights throughout the process:

   a.   To be treated with respect, dignity, and sensitivity;
   b.   To receive appropriate support from the University;
   c.   To receive information about the University's Sexual Misconduct Policy;
   d.   To receive information about available supportive measures;
   e.   The presence of an advisor throughout the process;
   f.   To receive notice of allegations of Title IX Sexual Misconduct and information about the University's complaint resolution process;
   g.   With the agreement of the complainant and respondent, to use an informal resolution process instead of a full investigation except in cases involving allegation of Title IX Sexual Misconduct by an employee of a student;
   h.   To participate or to decline to participate in the investigation or complaint resolution process. A decision not to participate in the process either in whole or in part will not prevent the University from proceeding with the information available, but it may impede the University's ability to investigate and resolve complaints;

17

i. A reasonably prompt and thorough complaint resolution process, including appeals;

j. The assurance that personnel involved in the complaint resolution process will not have a conflict of interest of bias, and will have appropriate training on all aspects of the Title IX Sexual Misconduct Procedures and relevant definitions;

k. To inspect, review, and respond to evidence during the investigation and prior to completion of the investigative report;

l. To receive an objective evaluation of all relevant evidence and the assurance that credibility determinations are not based on a person's status as a complainant, respondent, or witness;

m. The presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the complaint resolution process;

n. The assurance that the burdens of proof and gathering evidence sufficient to reach a determination regarding responsibility rests on the University and not the parties;

o. To a live hearing involving the presentation of witnesses and evidence, and questioning by advisors of all parties and witnesses;

p. To appeal the decision made or any sanctions imposed to the University's Provost or Vice-President of Human Resources;

q. To refrain from making self-incriminating statements;

r. Notification, in writing, of the case resolution, including the outcome of any appeals, and the final determination.

96.     The New Title IX Procedure strongly encourages timely reports of misconduct.

97.     According to the New Title IX Procedure, a complainant and/or respondent may decline to participate in the resolution process, but the University may continue the resolution process without their participation, "but doing so may impact the availability of evidence and the University's ability to proceed fairly and effectively."

98.     The New Title IX Procedure states that the University will work to resolve every complaint within 90 calendar days after the filing of a formal complaint, including appeals. However, "[t]ime frames may be extended for appropriate reasons, including but not limited to the complexity of a case; the availability of the parties, a party's advisor, or witnesses; concurrent law enforcement activity; the need for language assistance or accommodation of disabilities; or at certain times of the academic year (for example, during breaks, study periods or final exams)." If

there is a significant delay, the parties will receive a written explanation from the University with an estimate of anticipated additional time that will be needed.

99.    The New Title IX Procedure also prohibits retaliation stating, "any person who retaliates against a person for reporting, filing a complaint of, participating in the investigation or adjudication of allegations of Title IX Sexual Misconduct is subject to disciplinary action up to and including expulsion from the University or termination of employment at the University."

100.    The New Title IX Procedure states that the resolution process may be initiated by the complainant, Title IX Coordinator, or a third-party reporter by filing a third-party report, complaint, or formal complaint. The University will review all of these reports, but a formal complaint must be filed to initiate an investigation.

101.    The New Title IX Procedure lists three available processes for complainants. First, supportive measures, which are available regardless of whether a formal complaint is filed. Second, informal resolution process, which requires a formal complaint to initiate this process. Third, the formal resolution process, which requires a formal complaint and consists of three states – investigation, hearing, and appeal.

102.    A complainant may request confidentiality, however, to pursue the informal or formal resolution processes the complainant's identify must be disclosed to the respondent.

103.    Once a formal complaint is filed, the parties will be offered to meet with EOO, if the respondent is an employee, affiliate, or non-affiliate. At that meeting, each party will be provided with a notice in writing containing the following information:

      a. An explanation of the process for investigating and adjudicating complaints of Title IX Sexual Misconduct, including appeals;
      b. A copy of the Sexual Misconduct Policy and these Procedures;
      c. A copy of the formal complaint which must include the following:
            1. Identities of the parties involved in the incident (if known to the University);

    2. The conduct that forms the basis for the allegations of Title IX Sexual Misconduct; and

    3. The date/time of the alleged incident (if known).

d. A statement that the respondent is presumed not responsible and that a determination regarding responsibility will be made at the end of the complaint resolution process;

e. A statement that the parties may have an advisor of their choice, who may be an attorney, during the complaint resolution process, including during any meeting, interview, or hearing;

f. A statement that the parties may inspect and review evidence during the complaint resolution process;

g. A statement identifying any provisions in the University's codes of conduct or policies that prohibit knowingly making false statements or knowingly submitting false information during the complaint resolution process;

h. A statement that the University will identify the date, time, location, participants, and purpose of all hearings, investigative interviews or other meetings with sufficient time for the party to prepare to participate;

i. An instruction to the parties that they should not destroy any potentially relevant documentation in any format;

j. An explanation of the prohibition against retaliation;

k. If supportive measures have been imposed, an explanation of the scope of those measures and the parties' respective duties to comply with them.

104. The New Title IX Policy allows for complaints to be consolidated stating "formal complaints filed by a complainant against more than one respondent, or by more than one complainant against one or more respondents, or by one party against another party, may be consolidated into one formal complaint provided the allegations of Title IX Sexual Misconduct arise out of the same facts or circumstances."

105. The formal resolution process involves an investigation conducted by a trained investigator first, concluding with a summary of the relevant evidence gathered during the investigation, and then a live hearing with questioning of both parties permitted, after which a written determination regarding responsibility and sanction will be issued.

106. The formal resolution process uses a preponderance of the evidence standard which the New Title IX Procedure defines as "whether the evidence presented at the hearing supports a

finding that is more likely than not that the respondent engaged in Title IX Sexual Misconduct in violation of the Sexual Misconduct Policy."

107.    During the formal resolution process, the University bears the burden of proof and the burden of gathering sufficient evidence to reach a determination regarding responsibility.

108.    The New Title IX Procedure explains that "an investigator specifically trained in Title IX Sexual Misconduct investigations and these Procedures will be designated to conduct a prompt, thorough, and fair investigation." In cases involving allegations against a faculty or staff member, EOO will designate the investigator.

109.    According to the New Title IX Procedure, the investigation will include the following:

  a.  Party and witness interviews: one or more interviews with the complainant, the respondent, and any witnesses;
  b.  Gathering of evidence: the gathering of physical, documentary, or other relevant and available evidence, including law enforcement reports;
  c.  Excluded evidence: Evidence gathered during the investigation process will exclude the types of evidence described in Section XII(C)(9);
  d.  Presentation of evidence: The opportunity to present written statements, identify witnesses, and submit other evidence. The University may encourage University students or employees to cooperate with the investigation as witnesses regardless of the parties' selection of witnesses;
  e.  Advance notice of investigation events: sufficient advance written notice of interviews, meetings, and hearing for the relevant party or witness to prepare.

110.    Both parties may inspect and review evidence that is directly related to the allegations in the formal complaint before the completion of the final investigative report, including evidence that the University does not intend to rely upon the evidence in reaching a determination regarding responsibility.

111.    The EOO will make this evidence available to each party and the parties will have ten (10) days from the receipt of such evidence to submit a written response, which may include a

request to review additional evidence. Investigators will review the responses and take any additional steps necessary. The investigator may allow parties an additional ten days to respond, in writing, to the written responses of the other party, including any new evidence provided.

112.    All evidence available to the parties for review before the completion of the final investigative report will be available for use by the parties at the hearing.

113.    The parties are expected to provide all relevant evidence during the investigation. As such, "[a]ny relevant evidence not submitted during the investigation may be excluded from consideration at the hearing by the chair if it is determined that such evidence was available to the party prior to the hearing."

114.    The investigator will create a final investigative report that summarizes the relevant evidence. This report will not make a determination as to whether a violation occurred, nor will it recommend an appropriate sanction. Instead, those decisions are left for the decision-maker during the hearing process. Once the final investigative report is sent to the party's, each party may submit a written response within seven (7) calendar days. This response may include objections to the investigator's determinations about relevance of the evidence.

115.    Once the investigation and final investigative report are complete, the University will conduct a live hearing to make a determination of responsibility. "A hearing panel will hear the evidence, make a final determination as to whether the conduct alleged in the complaint constitutes Title IX Sexual Misconduct, and if so, impose any sanctions, if any."

116.    Per the New Title IX Procedure, the hearing panel will consist of three people. Panel members will be appointed by the Title IX Coordinator for all cases not involving a student respondent and members will receive training on all aspect of the Sexual Misconduct Policy and

these Procedures. For faculty respondent cases, the panel members will be two staff members and one faculty member.

117.    The hearing panel will also have an appointed chair, "who is responsible for ensuring that the hearing proceeds in accordance with these Procedures and making relevancy determinations with respect to each question that is asked during the hearing. The University may, in its discretion, appoint a hearing panel chair who may be a third party and who will serve in the place of a staff member of the hearing panel."

118.    The New Title IX Procedures requires panel members to withdraw from proceedings if their relationship to a party or witness, or other circumstances leads them to believe that they cannot judge the matter fairly, without a conflict of interest, and without bias for or against complainants or respondents.

119.    Parties will receive notice of the time and location of the hearing within fourteen (14) calendar days of the final investigative report being issued.

120.    The chair will preside at the hearing and will make relevancy rulings with respect to each question asked during the hearing, and other rulings as they deem necessary to the orderly conduct of the hearing.

121.    Only the hearing panel members, complainant and respondent, their respective advisors, witnesses, only when called, and necessary University personnel are permitted to be present during the hearing.

122.    During the hearing, neither party may ask questions of the other party or any witness. Only the advisors may ask questions which must be direct, oral, and in real time. If a party does not have an advisor, the University will appoint one.

123.    After the hearing, the hearing panel will deliberate to determine the responsibility as to each allegation in the complaint. The hearing panel will create a written hearing report which will include the following:

a.  Identification of the allegations of Title IX Sexual Misconduct included in the complaint;
b.  Description of the procedural steps taken from the receipt of the formal complaint through the hearing;
c.  Findings of fact supporting the hearing panel's determinations;
d.  Hearing panel's credibility determinations concerning admissible relevant evidence;
e.  Hearing panel's conclusions regarding Sexual Misconduct Policy violations;
f.  A statement of, and rationale for, the determination regarding responsibility as to each allegation in the formal complaint;
g.  The specification of remedies designed to restore or preserve equal access for the complainant to the learning or work environment; and
h.  Permissible grounds for and procedures available to the parties to appeal.

124.    If the respondent is found responsible, the hearing report will be provided to the applicable dean of a school or college or vice president of an administrative unit to determine the appropriate sanction.

125.    Potential sanctions for faculty, staff, affiliates, and non-affiliates for violations of the Sexual Misconduct Policy include counseling or training, written warning/reprimand, administrative leave of absence (without pay), demotion, change of work location or schedule, suspension, or termination of employment.

126.    The New Title IX Procedure holds that "the written decision will be presumed to have been reached reasonably and appropriately, by a preponderance of the evidence. Therefore, a party may appeal the written decision determination only on the following grounds: (i) procedural irregularity that affected the outcome of the matter; (ii) new evidence that was not reasonable available at the time of the hearing panel's decision and could affect the outcome of the matter; or (iii) the Title IX Coordinator, investigator(s), hearing panel members, the Dean of

Students, or relevant dean of a school or college or vice president had a conflict of interest or bias for or against complainants or respondents generally, or the individual complainant or respondent that affected the outcome of the matter.

127.    Any appeal petition must be in writing and filed with the Title IX Coordinator within ten calendar days of receipt by the complainant and respondent of the written decision. Late submissions may be accepted under extenuating circumstances.

128.    In cases of complaints against faculty, students, and affiliates, the Title IX Coordinator will direct the appeal to the University Provost to determine the appropriate officer of the University to whom the appeal should be direct. The Vice President of Human resources will also be involved in the appeal.

129.    The appeal record consists of and is limited to the record of the original hearing, including the audio recording, and the appeal petition and response.

130.    Once the review of the appeal record is complete, the decision will be in writing and communicated to the parties within fourteen days of receiving the appeal petition.

131.    The Vice President of Human Resources or Provost of their respective Designee may:

    a.  Affirm, modify, or reverse the hearing panel decision as to responsibility of the respondent;
    b.  Affirm or modify (either increase or decrease) the disciplinary sanctions imposed; or
    c.  Remand the matter for further investigation or a new hearing. This shall ordinarily be done in the case of procedural irregularity or new and relevant evidence, for an assessment of the weight and effect of the new evidence and a determination after consideration of the new facts.

132.    The appeal decision is final.

III.    **The Alleged Instances of Misconduct**

**a. Jacob Mo[3]**

133.    Dr. Mo, the first of Dr. Ohira's students to file a complaint against him, initiated the retaliatory campaign against Dr. Ohira when his allegations were found to be unsupported.

134.    Beginning in the summer of 2020, Mo was one of the research students in the Lab. He was assigned to an incoming faculty member, Dr. Yu Ma, who was to start in September. Until Dr. Ma's arrival, Dr. Dibart assigned Dr. Ohira to act as Mo's interim mentor.

135.    Due to the Covid-19 pandemic, Mo attended classes virtually via Zoom from July of 2020 until the end of August 2020.

136.    On September 9, 2020, Dr. Ohira met Mo in person for the first time. Dr. Ohira attempted to tap Mo, who was seated, on the shoulder to say hello and welcome him. However, Dr. Ohira, who was suffering from frozen shoulders at the time, missed and ended up making minimal contact with Mo's stomach area instead. Dr. Ohira, in an effort to smooth things over, jokingly noted that the pandemic had caused everyone, including himself, to gain weight during the lockdown.

137.    At no point did Dr. Ohira ever intend nor attempt to harass Mo in any way, let alone to sexually harass him.

138.    Mo thereafter filed an informal complaint against Dr. Ohira, alleging that on September 9, 2020, Dr. Ohira engaged in sexually harassing behavior when he touched Mo's stomach. He further alleged that Dr. Ohira engaged in retaliatory conduct when Dr. Ohira asked colleagues about Mo's academics.

---

[3] Jacob Mo is a pseudonym.

139.    On December 1, 2020, Equal Opportunity & Title IX Investigator Jessica Nagle ("Nagle") notified Dr. Ohira that the EOO received a complaint alleging he may have violated BU's Non-Title IX Sexual Misconduct Policy. The notice did not identify the Reporting Parties but stated only that "beginning in the summer or fall 2020, you engaged in sexually harassing behavior toward four or five students by telling inappropriate jokes and inappropriately touching students." The notice pointed Dr. Ohira to the Sexual Misconduct Policy, even though the allegations related to non-Title IX sexual misconduct.

140.    Dr. Ohira met with Nagle on December 3, 2020, with Dr. Dibart serving as his advisor.

141.    During this meeting, Nagle again referenced "four or five students" that were involved in the allegations concerning Dr. Ohira, but did not identify any of them by name, other than Mo.

142.    Nagle questioned whether Dr. Ohira accepted responsibility for the actions alleged in the complaint, and whether he agreed that they would not happen in the future. Dr. Ohira responded in the affirmative, however he misunderstood the question being posed. Specifically, he thought that he was being asked whether he understood that the actions alleged were unacceptable and that they would not occur in the future.

143.    On December 16, 2020, EOO provided an amended notice of investigation, which named Mo as the reporting party. Nagle indicated that Mo was alleging that on September 9, 2020, Dr. Ohira engaged in sexually harassing behavior towards him by touching his stomach while asking if Mo's weight gain was due to Covid or pregnancy. Mo further claimed that Dr. Ohira subsequently engaged in retaliatory conduct towards him by asking colleagues about Mo's academics and by showing up in Mo's classes.

144.    Dr. Ohira vehemently disputed that he ever engaged in sexually harassing behavior toward Mo.

145.    Further, he denied that he showed up at Mo's classes or asked colleagues about Mo's academics, with the intent of harassing or retaliating against Mo.

146.    Instead, as an individual responsible for managing the Lab during Covid, Dr. Ohira had to understand the progress of each student's project in order to organize the Lab schedule and provide students access to certain rooms without overcrowding them.

147.    Additionally, regarding Dr. Ohira's attendance at any classes that Mo may have been a student in, this was pure happenstance as Dr. Ohira would attend classes with permission from the Department Chair and lecturers to ensure he was keeping up to date in his knowledge of certain topics.

148.    On January 15, 2021, Nagle asked Dr. Ohira by email: (a) whether he asked Dr. Bo and/or Dr. Smith about the investigation in any way; and (b) if he did ask either Bo or Smith about the investigation, did he do so before December 9, 2020? Dr. Ohira responded that he did not.

149.    Based upon this email, Dr. Ohira was able to deduce that Bo and Smith were two of the "four or five students" mentioned in the December 3, 2020 meeting. However, he did not learn the identities of all five witnesses until a full year later, in January of 2022.

150.    Given the nature of the allegations, the EOO investigated Mo's claims under Boston University's Non-Title IX Sexual Misconduct Policy, utilizing the Procedures for the Resolution of Non-Title IX Sexual Misconduct Complaints Against Faculty, Staff, Affiliates, and Non-Affiliates.

151.    After a formal investigation, on February 18, 2021, the University found Dr. Ohira not responsible for sexual harassment within the meaning of the Sexual Misconduct Policy.

152.    Despite the not responsible finding, Dr. Ohira was required to meet with Associate Dean of Students Dr. Joseph Calabrese, Dr. Dibart, Clinical Director of the Advanced Education Program in Periodontics Dr. Gail McCausland, and Director of Student Affairs Ms. Erick Stocks on March 15, 2021.

153.    During this meeting, the group discussed the results of the Mo investigation and referenced additional unprofessional conduct that was reported by other student residents during their participation as witnesses to the Mo investigation. Dr. Ohira would later learn that these same witnesses – Dr. Bo and Dr. Smith – would go on to file their own reports against Dr. Ohira, upon learning of the results of the Mo investigation.

154.    On April 30, 2021, Dr. Ohira received a warning letter (the "Warning Letter") from Associate Dean for Academic Affairs, Cataldo Leone ("Dean Leone") in follow up to the March 15 meeting.

155.    The Warning Letter reiterated the importance of engaging with others in the Goldman School of Dental Medicine in a wholly professional manner, refraining from retaliation, and complying with applicable policies.

156.    The Warning Letter also required Dr. Ohira to complete mandated training by June 30, 2021.

157.    The Warning Letter concluded by stating that a failure to meet the expectations outlined in the letter would result in Dr. Ohira's termination of his faculty appointment and employment at BU. This conclusion was based on the premise that Dr. Ohira had accepted responsibility for the actions, which he did not intend to do.

158.    Dr. Ohira completed all of the required training by May 28, 2021.

159.    Disappointed with the outcome of the investigation into his complaint, Mo thereafter spearheaded a retaliation campaign against Dr. Ohira, in an effort to have him removed from his position in the Lab and University. Notably, Mo expected to be in the Lab for at least three more years in order to complete his D.Sc (Doctor of Science in Dentistry) program.

160.    Mo gained the support of four other classmates and fellow members of the Dibart Lab that Dr. Ohira managed to pursue additional false complaints against him.[4] Mo was ultimately successful in encouraging the filing of four other complaints against Dr. Ohira, eventually leading to his termination from BU, as described in further detail below.

**b. James Po[5]**

161.    Dr. Po was one of Dr. Ohira's students in the MSD Research Program in Periodontology during the 2020-2021 academic year.

162.    Dr. Po filed a complaint against Dr. Ohira on July 17, 2021 which addressed six instances of alleged national origin discrimination which purportedly occurred between July 2020 and June 2021.

163.    On August 2, 2021, Dr. Ohira received a notice of investigation and allegations from Nagle dated July 29, 2021, related to Dr. Po. The notice indicated that he was alleged to have engaged in "behavior that potentially violates the University's Equal Opportunity/Affirmation Action Policy and Procedures."

164.    Specifically, Po, who is Arabic, alleged: (i) in August 2020 while working remotely, Dr. Ohira made remarks that Po believed were motivated by his national origin and used a "disrespectful tone" towards Po, which made him feel badly about himself; (ii) he observed Dr.

---

[4] Notably, as of September 2020, Jacob Mo was no longer Dr. Ohira's student as he began working under Dr. Ma. However, the other four students were Dr. Ohira's mentees.
[5] James Po is a pseudonym.

Ohira talk negatively about Po's colleagues; (iii) in January 2021, Dr. Ohira told Po that he should not speak Arabic in school; (iv) on March 3, 2021, Dr. Ohira yelled at Po when he asked Dr. Ohira a question about his lab samples; (v) on March 20, 2021, Dr. Ohira yelled at Po, asking him "what are you doing here?"; and (vi) in the spring of 2021, Dr. Ohira made offensive remarks about two colleagues.

165.    Dr. Ohira wholly disputed these allegations as he never made any remarks or engaged in any actions that could be considered discrimination based upon national origin. Given Dr. Ohira himself is an immigrant, he is particularly sensitive to and understands issues related to discrimination. As such, he would never subject his students to such experiences.

166.    The matter was to be investigated under the University's Equal Opportunity/Affirmative Action Policy and was governed by the Complaint Procedures for Alleged Discrimination and Harassment Cases.

167.    BU retained Dan Schorr, LLC to investigate the complaint against Dr. Ohira on or about August 2, 2021.

168.    Alyssa-Rae McGinn and Jenna Farrell served as the investigators. They also conducted the party and witness interviews.

169.    Dr. Ohira was interviewed by the Investigators on September 15 and September 17, 2021. Significantly, during these interviews, Dr. Ohira was questioned not only about the allegations made by Po, but also about the allegations made by Roe, Bo, and Smith, even though they were each being investigated under different policies and procedures. Further, Dr. Ohira later learned that each of the complainants also served as witnesses for each other.

170.    In the interviews, Dr. Ohira firmly disputed making any sexual advances or sexually natured comments toward any of his students, and adamantly denied that he ever discriminated against any student based on their national origin or race.

171.    In response to allegation one, Dr. Ohira made clear that from his perspective, he and Po had a good working relationship in the summer of 2020 and he never made discriminatory marks toward Po, nor used a disrespectful tone with him.

172.    In response to allegation two, Dr. Ohira explained that he did make comments in regard to students' productivity decreasing but denied that he ever spoke negatively about such students.

173.    In response to allegation three, Dr. Ohira, a non-native English speaker himself, acknowledged that he did instruct students to speak English in the laboratory however this statement was not discriminatorily motivated. Instead, he explained that it is imperative that a common language be used in the laboratory as this increases productivity and contributes to team cohesion. Dr. Ohira even provided a research article in support, entitled "Sharing the same languages helps us work better together" which discussed a study regarding collaborative performance. Moreover, Dr. Ohira explained that using the same language is a safety issue, as it ensures faculty members are able to understand what students are saying and know whether students are in need of immediate help, given the Lab contained chemicals and flammable materials.

174.    In response to allegation four, Dr. Ohira stated that he never yelled at his students and never expressed anger or frustration at students through yelling. He described that his voice does become louder and he talks faster if he wants to emphasize a point, if he is excited or passionate about something, and explained that he is an expressive person.

175.    As for allegation five, Dr. Ohira described a conversation he had with Po in which Dr. Ohira asked Po why he was in the Lab at a time when Dr. Ohira was aware that Po had another meeting scheduled. Dr. Ohira noted he may have raised the volume of his voice when speaking to Po, given they were some distance apart and he was wearing a mask, however he never yelled at him.

176.    Finally, in regard to allegation six, Dr. Ohira never made any discriminatory remarks about other students.

177.    On November 19, 2021, Dr. Ohira received the investigative report in which the Investigators determined based on a preponderance of the evidence that the conduct alleged in each instance constituted harassment on the basis of national origin, in violation of the Equal Opportunity/Affirmative Action Policy.

178.    Because this matter was investigated under the Equal Opportunity/Affirmative Action Policy, only the Complainant had the right to appeal the determination, leaving Dr. Ohira without a further avenue to challenge the findings.

179.    In transmitting the report to Dr. Ohira, Nagle informed Dr. Ohira that Dean Leone had reviewed and accepted the Investigators' findings and that he would determine any sanction or discipline pertaining to the finding.

180.    Nagle further noted that if Dr. Ohira wanted to review the Investigative Report and Findings, he was to contact EOO Data Manager Kelly Ann Matos to request access through Box.com. She did not provide any specific time frame by which Dr. Ohira was required to accept access and review the report, nor did she state that the link to the report would expire.

181.    As Dr. Ohira understood the remaining reports—for the Bo, Roe, and Smith matters—to be forthcoming, he did not review the Po report in November of 2021, as he intended to review all of the reports simultaneously.

182.    He indicated as much by email to Nagle on December 22, 2021, in which he inquired about the status of all of the allegations against him and noted he had not yet reviewed the Po report "because [he] was anticipating all results by now so that [he] could read and evaluate all of your decisions (Po, Bo, Smith, and Roe) together."

183.    Nagle did not provide a direct response to the December 22, 2021 email, but on January 3, 2022 issued to Dr. Ohira the Notice of Outcome for the Bo matter and a link to the final report in the Bo matter, as well as the Draft Report for the Roe matter.

184.    This was the first point at which Dr. Ohira learned the identities of the witnesses that were interviewed as part of the Mo matter, as well as what the other complainants and witnesses had stated in their interviews.

185.    The following day, January 4, 2022, Dr. Ohira noticed that the link for the Po report had expired. As such, Dr. Ohira made multiple requests to Nagle to provide a renewed link to the Po report so that he could review and respond to it.

186.    Ultimately, on February 10, 2022, Nagle advised Dr. Ohira that the University was denying his request to respond to the investigation report issued in the Po matter, depriving him of an opportunity to refute the false allegations made against him.

**c. Jane Roe[6]**

187.    Dr. Jane Roe ("Roe") joined the three-year MSD/CAGS program in July 2019 and was initially assigned to Dr. Salih as her mentor.

---

[6] Jane Roe is a pseudonym.

188. When Dr. Salih passed away in January of 2020, Roe was one of six students that were reassigned to Dr. Ohira's team.

189. Roe started her first animal experiment on July 2, 2020. During the first two weeks of the experiment, i.e., until July 17th, Dr. Ohira demonstrated for her how to conduct various tasks. This was the only period of time during which Dr. Ohira was alone with Roe in the Lab for more than a few minutes, other than on one occasion in May of 2021.

190. From mid-July through the fall of 2020, Dr. Ohira had little in-person interaction with Roe because she understood how to perform the daily lab work. They communicated primarily through text messaging through December of 2020 and occasionally met in the resident lounge.

191. On or about April 2, 2021, Roe contacted Dr. Dibart and Dr. Ohira to inform them that she wanted to present at the American Academy of Periodontology ("AAP") competition taking place in the fall of 2021. Though Drs. Dibart and Ohira were hesitant given her time constraints, Roe insisted, and Dr. Ohira agreed to assist her.

192. Given Roe's limited understanding regarding the topic of her project, on May 6, 2021, Dr. Ohira wrote the abstract for Roe's presentation at the AAP competition for her, which was due by May 16, 2021.

193. At no time between the summer of 2020 and the summer of 2021 did Roe raise any concerns regarding her interactions with Dr. Ohira.

194. Between May and early August of 2021, Roe failed to appear in the Lab to conduct her experiments on many occasions. Dr. Ohira completed much of the work for her.

195. On July 21, 2021, Roe learned that her abstract was not selected for oral presentation at the AAP competition, but that she was permitted to present her poster.

196.    Though Roe initially made a complaint regarding Dr. Ohira to Deputy Title IX Coordinator Joseph Calabrese on July 1, 2021, she did not file a formal complaint with the EOO until August 4, 2021, after several outreach attempts by the EOO between July 1 and August 1.

197.    In her formal complaint, Roe alleged that Dr. Ohira engaged in various instances of sexual misconduct between the summer of 2020 and July of 2021.

198.    On August 6, 2021, Ms. Nagle notified Dr. Ohira that she had met with Dr. Roe on August 2, 2021 to discuss her report that Dr. Ohira allegedly engaged in the following unwelcome conduct: (i) he touched Roe's butt on multiple occasions; (ii) slapped the front of Roe's groin area and "butt"; (iii) placed his groin on Roe's hip; (iv) placed his face next to Roe's face so that their noses touched; (v) placed his body on top of Roe's from behind while she was working; and (vi) hit Roe in the left breast with a closed fist. She further alleged that Dr. Ohira stated he "like her parts" and that she "was his until he gets married," would occasionally curse and slam doors, and once yelled at Roe to clean ice off of the floor with a broom. She claimed that this conduct had been ongoing for two years and included at least 100 instances of unwanted and unwelcome touching.

199.    Notably, in Roe's initial report, which was attached to the August 6 notification, she claimed that the alleged misconduct began in September of 2020. In contrast, the notice of investigation indicated that Roe was claiming the misconduct began prior to **and** after August 14, 2020.

200.    This was the first of many inconsistencies in Roe's account that would be revealed as the investigation process proceeded, all of which were ultimately overlooked and ignored by the Investigators and Hearing Panel in finding Dr. Ohira responsible for violations of policy.

201.    Because Roe reported alleged behavior occurring both prior to and after August 14, 2020, Nagle indicated that the conduct alleged to have occurred before August 14 would be reviewed under a different policy and examined under different definitions than the conduct alleged to have occurred after August 14.

202.    Specifically, the allegations of prohibited conduct occurring before August 14, 2020, would be reviewed pursuant to BU's Sexual Misconduct/Title IX Policy, using the following definition of sexual harassment:

> Section II.B. Sexual Harassment is unwelcome conduct of a sexual nature that has the effect of creating a hostile or stressful living, learning, or working environment, or whenever toleration of such conduct or rejection of it is the basis for an academic or employment decision affecting an individual. Conduct is considered "unwelcome" if the person did not request or invite it and considered the conduct to be undesirable or offensive. Sexual harassment includes any conduct or incident that is sufficiently serious that it is likely to limit or deny a student's ability to participate in or benefit from the University's educational programs or a faculty or staff member's ability to work, which may include a single incident of sexual assault or other serious sexual misconduct.

203.    This alleged conduct would be investigated and adjudicated pursuant to the Procedures for the Resolution of Sexual Misconduct Complaints Against Faculty, Staff, Affiliates, and Non-Affiliates.

204.    In contrast, the allegations of prohibited sexual misconduct occurring on or after August 14, 2020 would be reviewed pursuant to BU's Sexual Misconduct Policy which addresses prohibited sexual misconduct under the current Title IX regulations issued by OCR, and defines sexual harassment as follows:

> Section III.A.2. Sexual harassment means unwelcome conduct that a reasonable person would determine to be so severe, pervasive, and

objectively offensive that it effectively denies a person equal access
to the University's education programs or activity.

205.    Though this alleged conduct would be investigated and adjudicated based upon a

different definition, such allegations were subject to the same procedures—the Procedures for the

Resolution of Sexual Misconduct Complaints Against Faculty, Staff, Affiliates, and Non-

Affiliates.

206.    By letter dated August 6, 2021, the same day Dr. Ohira was notified of the Roe

complaint, Dean Leone notified Dr. Ohira that he was being placed on paid administrative leave,

due to the EOO's receipt of "complaints from a number of residents about [his] behavior." Dean

Leone noted the complaints alleged "serious misconduct, including sexual harassment and

harassment based on national origin." As of the time he received Dean Leone's letter on August

6, 2021, Dr. Ohira had not yet been notified of the reports initiated by Dr. Roe, Dr. Bo, or Dr.

Smith.

207.    The administrative leave took effect immediately, without affording Dr. Ohira any

opportunity to challenge the basis for the decision, or to defend against the accusations which were

the impetus for issuance of the leave.

208.    Dean Leone further advised that the leave was to remain in effect pending the

completion of EOO's investigations of the complaints.

209.    Finally, Dean Leone noted that the decision to place Dr. Ohira on administrative

leave was approved by University Provost Jean Morrison and Medical Campus Provost Karen

Antman.

210.    On August 10, 2021, Dr. Ohira was notified that the assigned investigator for the

Roe matter was once again, Alyssa-Rae McGinn.

211.    On September 1, 2021, Dr. Ohira received a Revised Notice of Investigation and Allegations.

212.    The Revised Notice of Allegations included substantial and material changes as compared to the initial notice, based upon additional information provided by Roe to McGinn the day prior.

213.    Specifically, Roe now alleged that Dr. Ohira also invaded her personal space, repeatedly asked if she had a boyfriend, touched her breast, cupped and squeezed her buttocks, aggressively grabbed her neck and arm, threw ice at her, swore at her regularly, slammed doors, and refused to talk to her.

214.    The addition and revision of Roe's allegations resulted in the inclusion of a charge for sexual assault.

215.    The inclusion of these supplementary claims, which were brought up only after Roe had met with Investigator McGinn, raised a question as to whether McGinn encouraged and/or assisted Roe in coming up with additional charges.

216.    For the allegations occurring on or *before* August 13, 2020, the conduct was to be reviewed and assessed based upon the following definition:

> Section II.A. Sexual assault is actual or attempted sexual contact with another person without that person's consent. Sexual assault includes but is not limited to intentional touching of another person's intimate parts without that person's consent.

217.    For the allegations occurring on or *after* August 14, 2020, the conduct was to be reviewed and assessed based upon the following definition:

> Section III.A.3. Sexual assault is any sexual act directed against another person, without that person's consent (including instances where the victim is incapable of giving consent) and includes fondling, which is defined as touching of the private body parts of

another person for the purpose of sexual gratification, forcibly and/or against that person's will or not forcibly.

218.    Dr. Ohira was questioned by the Investigator regarding the Roe matter during the same September 15 and September 17, 2021 interviews noted above. He firmly disputed making any sexual advances or sexual comments toward Roe or any of his students.

219.    Specifically, as to the allegation of touching Roe appropriately, Dr. Ohira was clear that he never touched her inappropriately and never did so in any sexual manner.

220.    Dr. Ohira stated that it is common to stand in close proximity to students while in the Lab because they are often looking at microscopic materials, however he affirmed that he never acted inappropriately toward Roe, or any other student.

221.    Dr. Ohira further stated that he never commented on Roe's appearance, never yelled at her, and without question, never engaged in any physical or violent contact with Roe.

222.    On September 26, 2021, Dr. Ohira submitted a written response intended to supplement and further detail the information provided during his interview, which he felt may have been impacted by his language limitations.

223.    Though Roe participated in a follow up interview with the Investigators, Dr. Ohira was not requested to participate in a follow up interview.

224.    On January 3, 2022, Dr. Ohira received a Draft Investigative Report for the Roe matter.

225.    In reviewing the Draft Investigative Report, Dr. Ohira learned for the first time what Roe (and the other witnesses) had alleged, which included various fabrications about him.

226.    Upon review of the Draft Investigation Report, it became clear that Roe had begun disseminating false information regarding her interactions with Dr. Ohira to her colleagues, months prior to when she filed her formal complaint.

227.    Dr. Ohira submitted his written response to the Roe report on January 24, 2022. Within his response, he discussed the hearsay testimony provided by Roe's "witnesses", the evident collaboration among Mo, Po, and Bo, pointed to the inconsistent statements made by Roe throughout the investigation process, provided evidencing disputing the timeline of events offered by Roe, identified witnesses that he requested be interviewed, pointed out additional procedural errors and biases exhibited by the Investigators, and refuted each allegation made against him with objective evidence.

228.    On February 25, 2022, Roe submitted a response to Dr. Ohira's response to the Draft Investigative Report, in which she attempted to dispel any notion of collaboration with the other witnesses and claimed that she had blocked Dr. Ohira on Instagram in the summer of 2021.

229.    Her response document did not address many of the inquiries raised in Dr. Ohira's response including, but not limited to: (i) her allegation that she received an email from Dr. Dibart on May 6, 2021 concerning her work with Dr. Ohira; (ii) her allegation that Dr. Ohira's access card was not working on August 4, 2021; (iii) her allegation that Dr. To[7] was claiming that he had been touched on his buttocks; and (iv) her assertion that she knew the contents of Dr. Ohira's conversation with his wife.

230.    On March 2, 2022, Dr. Ohira submitted evidence establishing that Roe had not blocked Dr. Ohira on Instagram as of January 2022 but had done so close in time to February 25, 2022. Indisputably, after reading Dr. Ohira's written response to the report, she then proceeded to block his account, in an effort to retroactively create evidence supporting her claims. Instead, she falsified evidence which should have been considered by the Hearing Panel in assessing her credibility.

---

[7] Dr. To is a pseudonym.

231.    On March 4, 2022, McGinn informed Dr. Ohira that the Investigators had concluded gathering additional relevant evidence, and that Dr. Ohira was permitted to review and respond in writing to such evidence by March 14, 2022.

232.    Upon review of the "new evidence," Dr. Ohira observed that several items he had previously requested be gathered by the Investigators as part of the investigation were not included in the file. As such, reached out to McGinn to inquire about such items including: (i) an email from Dr. Dibart to Roe allegedly dated May 6, 2021 concerning her work with Dr. Ohira; (ii) a text message conversation that allegedly took place in February 2021 between Roe and Dr. Lo[8] with time stamps; and (iii) data from a microplate reader, to be collected by Dr. Dibart.

233.    McGinn responded on March 8, 2022 stating "the evidence uploaded to the Box.com folder represents all of the evidence we determined was relevant to this matter. The period for gathering additional evidence has closed." BU never relayed this arbitrary deadline of March 4 for the parties to submit additional evidence to Dr. Ohira. The evidence from Dr. Dibart was eventually submitted and accepted by McGinn on March 11, and would have led to clear and indisputable information establishing that Roe was not in the Lab as often as she claimed. However, the Investigators simply uploaded the raw data without noting the significance of this information. There was no indication that they attempted to analyze the information, nor did they ask Dr. Ohira to clarify the information if they failed to understand the significance of it.

234.    Dr. Ohira submitted a response to the additional evidence gathered on March 16, 2022. His response included an explanation of the importance of the data provided by Dr. Dibart: the timestamps for the files were clear evidence of Roe's lab attendance, as using this particular machine was the only reason for her to come to the Lab. However, the Investigators uploaded the

---

[8] Dr. Lo is a pseudonym.

files in a manner that destroyed the timestamps, making the evidence useless. Notably, Roe did not submit any response.

235.    On March 23, 2022, Nagle notified Dr. Ohira that McGinn had completed her investigation and BU had appointed Brett Sokolow from TNG Consulting, LLC to serve as the Hearing Panel Chair.

236.    Also on March 23, 2022, Dr. Ohira was informed that BU had "been working to finalize an administrative investigation into alleged violation(s) of the Sexual Misconduct Policy," and as such, that Dr. Ohira would have an opportunity to review the final investigation report, as well as the file of directedly related evidence that was not included in the final report based upon the Investigator's determination that it was not relevant.

237.    Dr. Ohira was given a minimum of ten calendar days prior to the hearing to review the final report and the file of evidence that was excluded from the report. The Final Report failed to include much of the clear evidence provided by Dr. Ohira which directly disproved Roe's allegations.  This included but was not limited to the importance of the data provided by Dr. Dibart, as described above.

238.    On March 29, 2022, Dr. Ohira received a Notice of Hearing, scheduling the hearing for April 15, 2022 and identifying the Hearing Panelists as Professor Fatema Fazendeiro and Associate Dean Lynn O'Brien Hallstein.

239.    On March 31, 2022, Dr. Ohira submitted an objection to the participation of Associate Dean Hallstein as a member of the Hearing Panel, given her stated interests in gender studies and feminist theory, which suggested a probable partiality in favor of Dr. Roe, the female accuser.

240.    Nagle denied Dr. Ohira's request on April 5, writing in part: "I have conducted an objective evaluation and determined that Dr. Lynn O'Brien Hallstein's research and teaching interests do not create a conflict of interest or demonstrate bias in favor of either complainants or respondents."

241.    In response to Dr. Ohira's pre-hearing written submissions, Mr. Sokolow wrote on April 4, 2022 as follows: "I want us all to be focused narrowly on the evidence that proves or disproves the <u>actual</u> charges. . . . [t]here is a lot of collateral evidentiary "noise" in this matter, and I intend to screen out all of that noise for the hearing. Please keep this is mind for your pre-hearing evidentiary requests."

242.    On April 7, 2022, prior to the pre-hearing meeting, Dr. Ohira submitted to Mr. Sokolow his response to the final investigation report, a document regarding the relevancy of certain evidence, and a response to Roe's evidence submission.

243.    Dr. Ohira and his advisor met with Mr. Sokolow and Nagle on April 7, 2022 for a pre-hearing meeting.

244.    During the meeting, Mr. Sokolow explained the hearing process, noting that he would try and make the hearing as "trauma informed" and "enormously fair" as possible.

245.    He further observed that the Investigators considered much information that he viewed as irrelevant to the charges, and that he would stop any witness from testifying during the hearing about such irrelevant information.

246.    On April 11, 2022, Mr. Sokolow identified the witnesses that would be called at the hearing on the grounds that they possessed relevant evidence. This witness list did not include several witnesses requested by Dr. Ohira.

247.    In his April 11, 2022 correspondence, Mr. Sokolow expressed that no other witnesses would be contemplated and that the "panel will accept the testimony of witnesses [Ma, Mo, and To] as credible based on the investigation report, without having to call them at the live hearing."

248.    This outright acceptance of credibility was particularly concerning in light of the fact that one of the main purposes of a live hearing is to allow the accused an opportunity to challenge the credibility and testimony of the witnesses against him.

249.    Further, one day prior to the hearing, Dr. Ohira learned that the sole neutral witness, whom he expected to provide testimony favorable to him, Dr. Serge Dibart, would not be able to attend the hearing.

250.    On April 15, 2022, Dr. Ohira appeared for the hearing on the Roe matter.

251.    During the hearing, the Hearing Board members and Hearing Chair committed several procedural errors and demonstrated a bias against Dr. Ohira, all of which contributed to the erroneous finding against him. Such errors and biases include, but were not limited to, the following:

    i.    Dr. Ohira was not permitted to give his full opening statement. At the beginning of the hearing, he asked Mr. Sokolow whether he could submit the full version of the statement in writing afterwards, given it was difficult for him to read English out loud and he reads very slowly. Mr. Sokolow responded that this was fine and confirmed that Dr. Ohira could submit the written version of his opening after the hearing. However, when he attempted to do so after the hearing concluded, Mr. Sokolow changed course and stated that Dr. Ohira could only submit the shorter version that he had read during the hearing itself, which was less than half of what he had planned to say. This deprived Dr. Ohira of a full and meaningful opportunity to be heard, as the Board did not hear the additional material information that Dr. Ohira had included as part of his full opening statement.

    ii.    Dr. Ohira had difficulty understanding portions of the hearing due to the language barrier, and as such, was not able to provide the most direct and coherent responses to some of the questions posed to him during cross-examination by Roe's advisor, as well as during the questioning by Mr.

Sokolow. Even with the assistance of a translator, it was still difficult to follow along with the lines of questioning, when he had to not only ensure he understood the question, but also ask the translator for any clarifications, await any feedback from the person asking the question, and then formulate an answer in English. While the translator was available to assist, the difficulty in seeking translation assistance while under stress and during a proceeding conducted over Zoom made it incredibly difficult for him to clearly articulate certain points. The Hearing Board's outcome letter confirmed that it had in fact misinterpreted or misconstrued significant portions of his testimony.

     iii.   During the cross-examination of witness Po, Dr. Ohira's advisor sought to ask questions related to Po's interview statement that Dr. Ma and Dr. Ohira had spoken to each other in Chinese. In the midst of this line of questioning, Mr. Sokolow cut off Dr. Ohira's advisor, noting that such questions were not relevant. However, if Mr. Sokolow had permitted one follow up question by Dr. Ohira's advisor (i.e., does Po know that Dr. Ma and Dr. Ohira only have English as a common language), it would have become apparent that the questioning was directly relevant as it would have established that this witness was not being truthful in his testimony, and therefore was not credible. Had Mr. Sokolow truly reviewed the materials extensively, he would have understood the importance of this issue and would have allowed Dr. Ohira's advisor to continue with this topic of inquiry. Instead, Mr. Sokolow precluded cross-examination of a witness by Dr. Ohira's advisor on a critical point.

     iv.   Though Dr. Mo did not appear as a witness at the hearing, his testimony was nonetheless improperly credited. This is of particular concern because it was Dr. Mo's complaint against Dr. Ohira, for which he was found not responsible, that served as the impetus for the subsequent complaints against him, including Dr. Roe's. The Hearing Board disregarded Dr. Ohira's testimony and accepted without question the testimony of an unreliable, and clearly maliciously motivated witness Dr. Mo, who did not even appear before them, as more credible than <u>Dr. Ohira</u>.

252.    On April 19, 2022, Dr. Ohira submitted his impact statement.

253.    On April 28, 2022, Dr. Ohira received the Hearing Board Outcome Letter.

254.    The Hearing Board Outcome Letter indicated that the Hearing Panel reached a unanimous finding that the preponderance of the evidence proved the sexual assault allegations made by Roe under both the pre-August 2020 and post-August 2020 policies, as well as the pre-August 2020 sexual harassment allegations.

255.    Specifically, the Hearing Board concluded that "sexual touching took place without consent on many, many occasions." Although the Hearing Board did not find that allegations of

verbal sexual harassment were proven, they still found that sexual harassment had occurred under the pre-August 2020 Sexual Harassment Policy "because of the non-consensual acts of physical sexual contact."

256.    The Hearing Board Outcome Letter explained, "[i]n that sense, the findings overlap multiple Policies that address the same conduct and are not cumulative. The Hearing Board found three Policy violations, all for the same conduct occurring over an extended period of time."

257.    Consistent with the preceding steps in the investigation process, the Hearing Board Outcome Letter included significant errors in its rationale and in the conclusions reached.

258.    First, the Hearing Board claimed in its decision letter that the findings were not cumulative, however the Hearing Board found Dr. Ohira responsible for three policy violations, even though such violations were all based on "the same conduct occurring over an extended period of time."

259.    Second, the Hearing Board improperly overlooked the inconsistencies in Dr. Roe's testimony, in order to find her credible. For instance:

   i.    The hearing board seemed to find Dr. Roe's testimony to be particularly compelling when she physically demonstrated to the Board where the alleged contact took place. However, the Hearing Board improperly viewed this demonstration as reinforcing Dr. Roe's allegations notwithstanding that it directly contradicted her prior testimony. Specifically, during the hearing, she showed that the alleged contact was "often high up on her buttocks, toward her waist, rather than overtly cupping or squeezing her butt cheeks." This was directly inconsistent with her prior testimony provided throughout the investigation, wherein she claimed that Dr. Ohira "grabbed", "clenched" or "squeezed" her buttocks. Yet, instead of recognizing the inconsistency in her testimony, the Board instead illogically deemed this display as being even more corroborative of her claims.

   ii.    Dr. Roe claimed at the hearing that she had a new advisor for her thesis and that she was writing something entirely different than what she had been working on with Dr. Ohira. However, this statement by Dr. Roe was provably false, as Dr. Roe ultimately used the abstract that Dr. Ohira primarily wrote for her presentation as the basis for her thesis. Had Dr. Dibart been able to appear as a witness, he would have testified that Dr. Roe did not have a new thesis advisor.

      iii.    Dr. Roe falsely claimed that she had blocked Dr. Ohira on Instagram in January of 2022. Dr. Ohira submitted evidence establishing that Dr. Roe had not blocked Dr. Ohira on Instagram as of January 2022 but had done so close in time to February 25, 2022. Indisputably, after reading Dr. Ohira's written response to the report, Dr. Roe then proceeded to block his account, in an effort to retroactively create evidence supporting her claims. The Hearing Panel entirely disregarded the fact that Dr. Roe falsified evidence which should have been considered in assessing her credibility.

260.    Third, the Hearing Board Outcome Letter noted that the Hearing Board members "reviewed the extensive investigation file and prepared questions for the parties and witnesses," however this was far from accurate.

261.    It was apparent that the board members had not fully reviewed the file, as the two board members essentially failed to ask either the parties or witnesses any questions whatsoever. Given the report spanned nearly 70 pages, and with a hearing that lasted 8.5 hours, one would expect at least a few questions per witness, and more for each party, if they had truly reviewed the file in detail. The clear lack of interest observed over Zoom during the hearing itself, combined with the failure to ask any material questions, demonstrated that the Board had already made their decisions regarding whether any policy had been violated, before the hearing even began.

262.    Fourth, the Hearing Board improperly considered, and found against Dr. Ohira, on the charges numbered A2 (allegedly asking Roe about her personal life) and B2 (allegedly asking Roe about her personal life and commenting on her appearance). According to Mr. Sokolow's email of April 4, 2022 at 2:26 p.m., he expressed: "I understand that the investigation cast a wide net, but I really don't see from my review of the file how A2, A3, B2, and B4 relate to an allegation of sexual harassment." He went on to state: "This is something I will clarify through my pre-hearing meetings with you and the complainant, so that you know going into the hearing whether you need to defend those allegations or not."

263.    During Dr. Ohira's pre-hearing meeting with Mr. Sokolow on April 7, 2022, Dr. Ohira repeatedly asked what would happen to the non-sexual harassment allegations, A2 (allegedly asking Roe about her personal life), A3 (allegedly following Roe's Instagram account), B2 (allegedly asking Roe about her personal life and commenting on appearance) and B4 (allegedly blaming Roe for an issue with the laboratory freezer).

264.    As confirmed by Mr. Sokolow's email of April 4, 2022 as well as during the pre-hearing meeting, the only charges to be considered at the hearing were A1, B1 and B3 which related to alleged instances of sexual harassment and assault. Consequently, these were the charges that Dr. Ohira prepared for, and which his advisor cross-examined the witnesses on.

265.    Though Mr. Sokolow expressed that he did not see how such allegations related to an allegation of sexual harassment, he ultimately allowed Dr. Roe to discuss information concerning those allegations during the hearing, despite the understanding that these charges would not be considered.

266.    Evidently, Mr. Sokolow conveyed different information to Dr. Roe and her advisor because during the hearing, they continuously presented information, including her claim about blocking Dr. Ohira on Instagram which could have been easily refuted, related to the charges that Dr. Ohira had been assured would not be considered. This was extremely prejudicial, and a clear error in the process which further deprived him of a fair proceeding, and which ultimately impacted the outcome.

267.    Fifth, the Hearing Board rationalized its improper finding on the grounds that Dr. Ohira "was not accountable" for the alleged misconduct, denied the allegations, and did not show "remorse or contrition" for the alleged actions. However, given Dr. Ohira disputed the allegations,

and had a fundamental right to defend himself against false charges, it was a grave error for the Hearing Board to employ an adverse presumption against him.

268.    Sixth, Po, Roe, Bo and Smith were all witnesses in the Mo matter (and therefore had knowledge of the claims made against Dr. Ohira) and all notices were delivered to him within one week in August of 2021. This was too much of a coincidence to be merely overlooked. Yet, the Investigators, Title IX Coordinator, and Hearing Board members all disregarded the clear evidence of retaliation and collaboration, despite the overwhelming evidence supporting the likelihood that this occurred.

269.    During the hearing, Mr. Sokolow asked each witness their thoughts on Dr. Ohira's theory that there was collaboration among the complainants. The Hearing Board seemed to assign great weight to the answers provided by the witnesses when they denied having engaged in any such conduct. However, common sense suggests that no witness would admit to engaging in collaboration or collusion. Notably, while the Hearing Board accepted without question the witnesses' denials of having engaged in collaboration, despite evidence establishing otherwise, they rejected Dr. Ohira's denial of having engaged in any misconduct, despite clear evidence refuting Dr. Roe's claims.

270.    The Hearing Board further erred when it overlooked the various inconsistencies and contradictions in Roe's testimony, as well as the testimony of her witnesses, in an effort to find her more credible. By way of example but not limitation:

      i.    Roe initially reported that the conduct became more "sexually charged" in May of 2021 when she claimed to have been in the lab every other day. However, after seeing Dr. Ohira's documentary evidence which established that she was in the Lab only once, on May 29, 2021, she then changed her testimony during the hearing to say that the alleged conduct became sexually charged in June of 2021.

     ii.    Similarly, while she initially claimed that the alleged conduct occurred "since September 2020" she subsequently changed her testimony to claim that it began

prior to August 14, 2020. The significance of this date is not lost, and it appears that the Investigators or the EOO either informed Dr. Roe of the change in policies as of this date or encouraged her to extend the date of the allegations to claim that they began prior to August 14, 2020. These are but some of the instances where Dr. Roe revised her testimony after being faced with evidence Dr. Ohira presented that directly disputed her claims. Yet inexplicably, none of this was taken into consideration when assessing credibility of the parties.

iii.   Dr. Roe allegedly reported to Dr. Calabrese that Dr. Ohira had touched her buttocks multiple times in September/October of 2020. However, when Dr. Ohira met with Dr. Calabrese on October 8, 2020, he never mentioned such allegations. When Dr. Ohira requested that the Investigators interview Dr. Calabrese and ask about this, they declined to do so. This was another instance of the Investigators failing to speak with any witnesses that could have supported his account, and disputed Dr. Roe's.

iv.   Despite claiming that Dr. Ohira touched her over 100 times, Dr. Roe was unable to recall which hand he allegedly touched with her. Yet, this was not considered by the Hearing Panel when assessing her credibility.

v.   Dr. Roe initially claimed to have blocked Dr. Ohira's Instagram account during the summer of 2021. However, Dr. Ohira disputed this claim by producing digital evidence which showed that she did not block him until February 25, 2022, and only after she reviewed his response to the report wherein he discussed this issue. The Investigators failed to update the Final Report to reflect this and failed to request that Roe produce evidence supporting her claim.

vi.   During the hearing, Roe's witnesses provided testimony that differed from the accounts presented to the Investigators during their interviews. It was apparent that the witnesses revised their accounts to align with each other and provide additional corroboration for Roe's claims. Despite this indication of collaboration, the Hearing Panel again overlooked this evidence.

271.   Finally, during the pre-hearing meeting on April 7, 2022, Dr. Ohira was informed that he should submit an impact statement within two business days of the close of the hearing, to be considered by a sanctioning officer only when and if he was found responsible for a policy violation.

272.   Dr. Ohira appeared for the hearing on April 15, 2022, and timely submitted his impact statement on April 19, 2022. The following day, on April 20, 2022, Nagle forwarded to him a copy of the impact statement submitted by Dr. Roe. When Dr. Ohira questioned why Nagle had shared Dr. Roe's impact statement with him, chairperson Mr. Sokolow responded by email,

explaining that "impact statements are only shared with the Dean if a finding of violation is made, and if they are shared with the Dean, they are also shared between the parties… [t]he panel has not seen them, but they have been shared with the Dean who is responsible for making the decision on sanctions."

273.    However, at this point Dr. Ohira had not received notice of the final decision, nor had he been notified that a finding against him had already been reached. Yet, he discovered that he had in fact been found responsible for a policy violation by virtue of Nagle's sharing of Dr. Roe's impact statement with him. The failure to properly notify Dr. Ohira of the findings reached, and to provide him with a copy of the decision before sharing his impact statement with the other party was a clear error and a violation of policy.

274.    A University Sanction Report (the "Sanction Report") accompanied the Hearing Outcome Letter. The Sanction Report was prepared by Dean Leone, who indicated that in addition to considering the documentation related to the Roe matter, he also considered and relied upon the report prepared in the Po matter, the March 2022 findings in the Bo matter, as well as the written warning issued to Dr. Ohira on April 30, 2021 as a result of the Mo matter. It was improper to consider those documents for purposes of determining a sanction with respect to the Dr. Roe matter, as those were separate matters involving different allegations and were not explored during the hearing on April 15.

275.    Ultimately, Dean Leone stated that the sanction to be applied was termination of employment with the University, effective May 20, 2022.

276.    Dr. Ohira submitted his appeal of the findings and sanction in the Roe matter on May 6, 2022.

277.    His appeal was based on: (i) procedural irregularities that affected the outcome of the matter; and (ii) biases exhibited against Dr. Ohira by the Title IX Coordinator, investigators, and hearing panel members.

278.    On May 26, 2022, Dr. Ohira was informed that his appeal was denied by the appeal officer, Associate Provost for Graduate Affairs Daniel Kleinman.

279.    The appeal decision lacked reasonable consideration and justification for the findings, when Kleinman blatantly disregarded the evident biases and procedural flaws described by Dr. Ohira.

280.    For instance, Kleinman erroneously concluded that the order of the witness interviews was irrelevant, determined that the Investigators' failure to interview witnesses identified by Dr. Ohira did not impact the outcome, inaccurately presumed that the Hearing Panel had reviewed the full investigation file when their participation in the hearing clearly demonstrated otherwise, overlooked the Hearing Panel's consideration of testimony regarding "past similar conduct" despite McGinn assuring Dr. Ohira that he should not worry about previous alleged incidents since he was not being investigated for those, ignored evidence of bias when Roe was permitted to present new evidence at the hearing while Dr. Ohira was instructed that he would only be permitted to introduce new evidence if it was unavailable previously, did not take issue with the Hearing Chair preventing Dr. Ohira from submitting his full opening statement despite the language barrier, and found it inconsequential that Dr. Ohira's advisor was not permitted to fully cross-examine the witnesses.

281.    As the appeal was the last available opportunity for Dr. Ohira to challenge the findings reached in the university disciplinary process, the sanction of termination from employment was made effective as of June 10, 2022.

**d. Betty Bo[9]**

282.    Dr. Bo joined the MSD Research Program in Periodontology on or about July 1, 2020.

283.    She initially attended classes via Zoom, but began attending school in person at the end of August 2020.

284.    On August 3, 2021, Dr. Bo filed her complaint against Dr. Ohira, on the same date that Dr. Smith filed her complaint.

285.    On August 10, 2021, Nagle sent to Dr. Ohira a Notice of Investigation and Allegations related to the allegations made by Dr. Bo, as well as a Mutual No-Contact Directive.

286.    Dr. Bo alleged that Dr. Ohira engaged in actions constituting sexual harassment in violation of the Sexual Misconduct Policy and discrimination based on national origin in violation of the Equal Opportunity/Affirmative Action Policy.

287.    Specifically, Dr. Bo claimed that Dr. Ohira erroneously called her "Indian" when she is a Canadian citizen, and made inappropriate comments related to her culture and nationality, such as "You are Indian and are supposed to be good at math."

288.    She also alleged that he engaged in unwelcome touching and made sexually natured remarks between September of 2020 and June of 2021.

289.    None of the foregoing allegations were remotely true; to the contrary, Bo's allegations consisted of her twisting innocent communications into alleged instances of discrimination.

290.    By way of example, on one occasion Dr. Ohira advised Dr. Bo that her ripped stocking was a clear violation of the lab's PPE protocol. He never made any comments of a sexual

---

[9] Betty Bo is a pseudonym.

nature related to the stockings, and only referenced it in the context of not complying with PPE protocol.

291.    Also on August 10, 2021, Dr. Ohira was informed that McGinn would serve as investigator on the Bo matter.

292.    Dr. Ohira appeared for the investigation interviews referenced above, on September 15 and September 17, 2021 and firmly disputed making any sexual advances or sexual comments toward Dr. Bo and adamantly denied that he ever discriminated against Dr. Bo—or any other student for that matter—based on their national origin or race.

293.    On January 3, 2022, Dr. Ohira was notified that the EOO had completed its investigation into Bo's allegations and determined that his conduct violated the Sexual Misconduct Policy and the Equal Opportunity/Affirmative Action Policy.

294.    Dr. Ohira was informed that only the complainant was permitted to appeal the findings reached on the allegations brought under the equal Opportunity/Affirmative Action Policy, but that he was also permitted to appeal the findings reached through the procedures applied to complaints filed under the Sexual Misconduct Policy.

295.    Dr. Ohira submitted a written response to the Draft Investigation Report on January 25, 2022. He firmly disputed making any sexual advances or sexual comments toward Dr. Bo.

296.    On February 25, 2022, McGinn notified Dr. Ohira that she had concluded the response review period and that she anticipated providing him a copy of the Final Investigative Report the following week.

297.    On March 9, 2022, Dr. Ohira was notified that the University had completed its investigation into Bo's allegations against him.

298.    Investigator McGinn determined by a preponderance of the evidence that he was responsible for violating the University's Sexual Misconduct Policy and the Equal Opportunity/Affirmative Action Policy.

299.    Specifically, McGinn concluded that Dr. Ohira: (i) made offensive and stereotypical remarks about Dr. Bo's national origin; and (ii) made unwelcome sexually natured jokes to Dr. Bo and touched her in an unwelcome manner.

300.    Because the investigation and adjudication of the Roe matter was still pending, the University determined that there was good cause to delay any potential sanction related to the outcome in the Bo matter.

301.    Subsequent to completion of the Roe matter, on June 1, 2022, Dr. Ohira learned that Dean Leone had made his final determination regarding sanctions. Dean Leone stated that because Dr. Ohira was currently on suspension from his employment and had already been notified that his employment was being terminated due to the findings in the Roe Title IX matter, he deemed it unnecessary to impose any additional sanction in the Bo matter.

302.    Dr. Ohira submitted his appeal in the Bo matter on June 8, 2022, based on (i) insufficient evidence to support the findings; (ii) new, relevant evidence that was unavailable to him during the investigation that could reasonably affect the outcome of the case (i.e. the evidence of collaboration revealed through the Roe hearing); and (iii) prejudicial bias on the part of the Investigator.

303.    Associate Provost Kleinman once again denied Dr. Ohira's appeal, on July 22, 2022, finding there was no information presented that would warrant overturning the result.

304.    In reaching this conclusion, Kleinman overlooked several points raised by Dr. Ohira, inappropriately justified the actions of the Investigators, and ignored inconsistencies and contradictions within the witnesses' statements.

**e. Sally Smith[10]**

305.    Dr. Smith joined the MSD Research Program in Periodontology on or about July 1, 2020.

306.    She initially attended classes via Zoom but began attending school in person at the end of August 2020.

307.    On August 3, 2021, Dr. Smith filed a formal complaint against Dr. Ohira, along with Dr. Bo.

308.    On August 12, 2021, Dr. Ohira received a Notice of Investigation and Allegations from Nagle, informing him of the complaint filed by Dr. Smith. Notably, Nagle also informed Dr. Ohira that Dr. Smith was declining to participate in the investigation and as such, Nagle would serve as the complainant in the matter.

309.    Despite Smith's express decision to not participate in the process, the Investigators nonetheless questioned Dr. Ohira, as well as all the witnesses, about Smith's allegations.

310.    Dr. Ohira participated in, and cooperated with, all steps of the investigation process related to Dr. Smith's complaint and as of January 4, 2022, was informed by Nagle that "the report regarding Dr. Smith's concerns is being finalized."

311.    Yet, on March 8, 2022, seven months after the initiation of the investigation, Dr. Ohira was notified that Dr. Smith had recently informed the EOO (on February 22, 2022) that she

---

[10] Sally Smith is a pseudonym.

now intended to proceed as a complainant on her own behalf and participate in the investigation of her allegations.

312.    As such, the previous investigation regarding Dr. Smith's complaint was dismissed, effective immediately, and a new case regarding Dr. Smith's complaint was opened, with a new investigation to be conducted by a new investigator.

313.    Dr. Ohira objected to this change in course, citing to Title IX regulations and University policy requiring that a formal complaint for sexual harassment be resolved promptly, to ensure fairness and accuracy.

314.    As such, Dr. Ohira noted the University's inexplicable decision to restart a near completed investigation, rather than supplementing it with any new information provided by Dr. Smith was improper and prejudicial, and requested that the University instruct Dr. Smith to participate in an interview, the transcript for which could simply be added to the current investigation record. Nagle declined the request on March 30, 2022.

315.    However, that same day, on March 30, 2022, Dr. Ohira received correspondence from Nagle indicating that Dr. Smith failed to respond to the Investigators' communication and failed to appear for her scheduled interview with the Investigator on March 23. Accordingly, the University decided to "honor Dr. Smith's wishes and close this matter effective immediately."

316.    Notwithstanding, the Investigators failed to redact from the investigation reports in the other matters, information concerning Smith and her allegations, in an apparent effort to present as much information against Dr. Ohira as possible, in order to ensure an adverse finding against him.

**IV.    <u>Dr. Ohira Files a Retaliation Complaint Against Jacob Mo</u>**

317.    On March 22, 2022, Dr. Ohira submitted a complaint of retaliation against Mo.

318.    Specifically, Dr. Ohira alleged that Mo filed a non-Title IX sexual misconduct complaint against Dr. Ohira in 2020, for an alleged incident on September 9, 2020.

319.    Dr. Ohira noted that on February 18, 2021, the University found him not responsible for a violation of the University's Sexual Misconduct Policy but still required him to undergo a series of required trainings.

320.    Dr. Ohira detailed in his complaint that in response to the finding of non-responsibility on Mo's allegations, Mo encouraged a number of his peers–including Drs. Po, Bo, Smith and Roe—to instigate a campaign against Dr. Ohira, which they did by filing complaints against Dr. Ohira in the summer of 2021.

321.    This collaboration was firmly established by Po during his testimony at the Hearing when he confirmed that the witnesses filed complaints as a "follow up" to Mo's case, because they wanted to "do something about it" and were advised by Student Affairs "to file complaints" and so "[they] filed complaints." Yet, the Hearing Panel improperly overlooked such information.

322.    Dr. Ohira further alleged that Mo provided false statements in the ensuing investigations in which he served as a witness, to ensure a responsibility finding against Dr. Ohira.

323.    Dr. Ohira met with assigned investigator Samantha Freeburn, Civil Rights Investigator in the EOO, and Erin Sullivan, Assistant Director of Equal Opportunity and Deputy Title IX Coordinator, on April 21, 2022 to discuss his complaint against Mo. Subsequently, Dr. Ohira also submitted a written description of the retaliatory acts by Mo.

324.    On June 24, 2022, Dr. Ohira learned that the University declined to pursue the complaint against Mo on the grounds that: (i) Mo's collaboration with other students to file complaints does not constitute retaliation; (ii) encouraging or assisting others in bring EOO complaints is protected activity and cannot be considered retaliation absent evidence that the

complaints were based on information that was materially false and made in bad faith; and (iii) while acknowledging that witnesses are prohibited from making materially false statements in bad faith, they found that there was no indication Mo did so here as Investigators found him to be credible.

325.    Dr. Ohira received a letter on June 2, 2022, terminating his employment effective June 10, 2022 as a sanction for violating the University's Title IX Policy in the Roe matter.

326.    As a result of Defendant's unfair, unlawful and gender-biased conduct, Dr. Ohira was subject to a flawed, improper and inequitable investigation processes which lacked the most basic elements of fairness.

327.    Due to Defendant's unfair, unlawful and gender-biased conduct, Dr. Ohira was treated as a perpetrator and presumed guilty from the moment the complaints were filed against him.

328.    Due to Defendant's unfair, unlawful and gender-biased conduct, Dr. Ohira was improperly terminated from his employment, which will substantially hinder his career opportunities, reputation, and livelihood for the remainder of his life.

329.    Due to Defendant's unfair, unlawful and gender-biased conduct, Dr. Ohira has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damages to his future earnings capacity and career prospects.

**COUNT I**
**Violation of Massachusetts Gen. L. ch. 151B**
**<u>Discrimination Based on Sex and Gender</u>**

330.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

331.    Mass. Gen. L. ch. 151B *et seq.* prohibits an employer from discriminating against an individual on the basis of their gender.

332.    By the conduct alleged in detail above, Defendant, through its agents and/or employees, violated Mass. Gen. L. ch. 151B *et seq.* by subjecting Plaintiff to disparate treatment and disparate discipline on the basis of his gender.

333.    BU demonstrated gender bias against Dr. Ohira when it pursued unfounded allegations of sexual misconduct brought by the female students, notwithstanding that they were initiated at the urging of Dr. Mo after his complaint against Dr. Ohira was found to be unsubstantiated.

334.    Disappointed with the outcome of the investigation into his complaint, Dr. Mo spearheaded a retaliation campaign against Dr. Ohira, in an effort to have him removed from his position in the Lab and University.

335.    He succeeded, as Dr. Ohira was found responsible for the charges brought by female students Dr. Roe and Dr. Bo, which BU then considered in the aggregate when deciding upon the ultimate sanction of termination.

336.    To establish a claim for discrimination under Mass. Gen. L. ch. 151B, a plaintiff must first demonstrate that: (i) plaintiff is a member of a protected class; (ii) plaintiff performed the job satisfactorily; and (iii) plaintiff suffered an adverse employment action. *See Sisco v. DLA Piper LLP,* 833 F. Supp. 2d 133, 148 (D. Mass. 2011) (internal quotations omitted). The "initial burden is not an onerous one." *Id.* An inference arises that the protected class characteristic served as a determining factor. *Id.*

337.    Plaintiff is a member of a protected class under Mass. Gen. Laws ch. 151B because he is a male.

338.    Prior to his termination, he was qualified to work as an employee for Boston University and satisfactorily performed the duties required by his position.

339.    As set forth above, Plaintiff was subjected to discrimination which culminated in an adverse employment action when he was terminated from his employment with BU effective June 10, 2022.

340.    Upon information and belief, BU still employs assistant professors of comparable qualifications to Plaintiff.

341.    As a direct and proximate result of the foregoing, Plaintiff did suffer and continues to suffer substantial damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

342.    Based on the foregoing, Defendant discriminated against Plaintiff in violation of Mass. Gen. L. ch. 151B.

343.    As a result of Defendant's violations of Mass. Gen. Laws ch. 151B, Defendant is liable to Plaintiff for damages in an amount to be determined at trial.

**COUNT II**
**Discrimination on the Basis of Sex/Gender in**
**<u>Violation of Title VII of the Civil Rights Act of 1964</u>**

344.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

345.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, prohibits an employer from discriminating against an employee on the basis of their sex.

346.    By the conduct alleged in detail above and herein, Defendant, through its agents and/or employees, subjected Plaintiff to disparate treatment and disparate discipline on the basis of his gender.

347.    To establish a claim for disparate treatment on the basis of gender, a plaintiff must demonstrate that: (i) plaintiff "belonged to a protected class;" (ii) plaintiff performed their job in a satisfactory manner; (iii) plaintiff's employer rendered "an adverse employment decision" against plaintiff; and (iv) plaintiff's employer continued to have their "duties performed by a comparably qualified person." *Bonilla-Ramirez v. MVM, Inc.,* 904 F.3d 88, 94 (1st Cir. 2018).

348.    Plaintiff is a male and is therefore a member of a protected class.

349.    Prior to his termination, he was qualified to work as an employee for Boston University and satisfactorily performed the duties required by his position.

350.    As set forth above, Plaintiff was subjected to discrimination which culminated in an adverse employment action when he was terminated from his employment with BU effective June 10, 2022.

351.    Upon information and belief, BU still employs assistant professors of comparable qualifications to Plaintiff.

352.    As described in the foregoing paragraphs, Defendant, by its individual and or concerted acts and/or omissions, including but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's sex or gender, in violation of the Civil Right Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000 to 2000e-17.

353.    As a direct and proximate result of the foregoing, Plaintiff did suffer and continues to suffer substantial damages, including without limitation, emotional and psychological distress,

loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

354.    Based on the foregoing, Defendant discriminated against Plaintiff in violation of Title VII.

355.    As a result of Defendant's violations of Title VII, Defendant is liable to Plaintiff for damages in an amount to be determined at trial.

**COUNT III**
**Violation of Mass. Gen. L. ch. 151B**
**Discrimination Based on Race, Color, or National Origin**

356.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

357.    Mass. Gen. L. ch. 151B *et seq.* prohibits an employer from discriminating against an individual on the basis of race, color, or national origin.

358.    Plaintiff has met his initial burden to establish a claim under Mass. Gen. L. ch. 151B for discrimination based on race, color, or national origin because: (i) he is a member of a protected class, as an Asian male; (ii) he performed his job satisfactorily; and (iii) he suffered an adverse employment action when he was terminated from BU effective June 10, 2022.

359.    As described above, BU, through its agents and/or employees demonstrated a bias against Dr. Ohira based on his race/national origin during the adjudication of Dr. Roe's complaint, as follows:

- Dr. Ohira was not permitted to give his full opening statement. At the beginning of the hearing, he asked Mr. Sokolow whether he could submit the full version of the statement in writing afterwards, given it was difficult for him to read English out loud and he reads very slowly. Mr. Sokolow responded that this was fine and confirmed that Dr. Ohira could submit the written version of his opening after the hearing. However, when he attempted to do so after the hearing concluded, Mr. Sokolow changed course and stated that Dr. Ohira could only submit the shorter version that

he had read during the hearing itself, which was less than half of what he had planned to say. This deprived Dr. Ohira of a full and meaningful opportunity to be heard, as the Board did not hear the additional material information that Dr. Ohira had included as part of his full opening statement.

- Dr. Ohira had difficulty understanding portions of the hearing due to the language barrier, and as such, was not able to provide the most direct and coherent responses to some of the questions posed to him during cross-examination by Roe's advisor, as well as during the questioning by Mr. Sokolow. Even with the assistance of a translator - the use of which Mr. Sokolow discouraged for the entirety of the hearing as opposed to only the portions where it was most necessary - it was still difficult to follow along with the lines of questioning, when he had to not only ensure he understood the question, but also ask the translator for any clarifications, await any feedback from the person asking the question, and then formulate an answer in English. While the translator was available to assist, the difficulty in seeking translation assistance while under stress and during a proceeding conducted over Zoom made it incredibly difficult for him to clearly articulate certain points. The Hearing Board's outcome letter confirmed that it had in fact misinterpreted or misconstrued significant portions of his testimony.

360.    Dr. Ohira is an Asian male, within a protected class, who at all times performed his position at an above satisfactory level.

361.    Dr. Ohira's proficiency in English remains minimal, especially in verbal communication.

362.    On information and belief, Defendants have not terminated white male employees of European ancestry for more serious sexual misconduct.

363.    On information and belief, in or about 2016, when more serious allegations of sexual harassment were made against Professor Eric Ruske, a white male of European ancestry, Defendants did not place Ruske on administrative leave or take disciplinary action against him. Defendants continued to allow Ruske to teach and to remain on campus.

364.    And, when two female students subsequently brought suit in federal district court, accusing both BU and Ruske of violating Title IX, the University rushed to Ruske's defense. *See Shyr v. Trustees of Bos. Univ.*, No. CV 16-11124, 2017 WL 1014999 (D. Mass. Mar. 13, 2017).

365.    On information and belief, when BU later received an anonymous complaint of sexual misconduct against Ruske, Defendants still took no disciplinary action against him. https://dailyfreepress.com/2021/09/24/second-bu-student-comes-forward-with-evidence-of-inappropriate-online-communication-from-professor-eric-ruske/

127.    On information and belief, Roe, BU's Title IX Coordinator, and the overwhelming majority of the key decision-makers in Dr. Ohira's Title IX proceeding were white and of European descent, including:

- Title IX Coordinator Nagle;
- Investigators Alyssa Rae McGinn and Jenna Farrell;
- Hearing Chairperson Brett Sokolow;
- Associate Dean Lynn O'Brien Hallstein;
- Then Associate Dean for Academic Affairs, Cataldo Leone;
- Associate Dean of Students Dr. Joseph Calabrese;
- Medical Campus Provost Karen Antman;
- University Provost Jean Morrison;
- Associate Provost for Graduate Affairs Daniel Kleinman.

366.    The fact that Dr. Ohira is an Asian male was a motivating factor in the discriminatory treatment and termination of employment that he suffered at the hands of Defendant.

367.    An adverse employment action based in whole or in part on account of race and/or color, ethnicity, and/or national origin constitutes prohibited discrimination.

368.    Based on the foregoing, Defendant engaged in unlawful employment discrimination on the basis of Plaintiff's race, color, and/or national origin, and thereby deprived him of rights secured under Mass. Gen. L ch. 151B.

369.    As a direct and proximate result of the foregoing, Plaintiff did suffer and continues to suffer substantial damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

370.    Accordingly, Defendant discriminated against Plaintiff based on his race, color, or national origin, in violation of Mass. Gen. L. ch. 151B.

**COUNT IV**
**Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e to 2000e-17 –**
**<u>Discrimination Based on Race, Color, or National Origin</u>**

371.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

372.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, prohibits an employer from discriminating against an employee on the basis of race, color, or national origin.

373.    Plaintiff has met his initial burden because: (i) he is a member of a protected class, as an Asian male; (ii) he performed his job satisfactorily; and (iii) he suffered an adverse employment action when he was terminated from BU effective June 10, 2022.

374.    Additionally, upon information and belief, BU still employs professors of comparable qualifications to Plaintiff.

375.    As described in the foregoing paragraphs, Defendant, by its individual and/or concerted acts and/or omissions, including but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's race and/or color and/or national origin, in violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. §§ 2000 to 2000e-17.

376.    As a direct and proximate result of the foregoing, Plaintiff did suffer and continues to suffer substantial damages, including without limitation, emotional and psychological distress,

loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

377.    Based on the foregoing, Defendant discriminated against Plaintiff in violation of Title VII.

378.    As a result of Defendant's violations of Title VII, Defendant is liable to Plaintiff for damages in an amount to be determined at trial.

**COUNT V**
**Breach of Contract**

379.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

380.    As an employee of BU, the following conduct policies constituted binding contracts between Dr. Ohira and BU: (i) Procedures for the Resolution of Title IX Sexual Misconduct Complaints Against Students, Faculty, Staff, Affiliates, and Non-Affiliates; (ii) Procedures for the Resolution of Sexual Misconduct Complaints Against Faculty, Staff, Affiliates, and Non-Affiliates; (iii) Equal Opportunity/Affirmative Action Policy; (iv) the Sexual Misconduct Policy; and (v) Procedures in Cases of Alleged Unlawful Discrimination and Harassment.

381.    As detailed above, the following is a non-exhaustive list of the ways in which Defendant violated Plaintiff's contractual rights to due process by failing to adhere to its own binding procedures with respect to the complaints brought against Dr. Ohira:

- BU violated the mandate of its Equal Opportunity Policy which, in part: "prohibits discrimination against any individual on the basis of race, color...sex, age, national origin...";
- Failed to conduct a fair and impartial investigation of all complaints, "with due regard for the rights of all parties";
- Failed to treat Dr. Ohira with respect, dignity, and sensitivity as required by the Title IX policies and procedures;
- BU failed to conduct a prompt and thorough investigation of the allegations;

- Did not assure that personnel involved in the complaint resolution process were free of biases;
- Failed to ensure that the hearing panel performed an objective evaluation of all relevant evidence or that credibility determinations were not based on Dr. Ohira's status as a respondent;
- Failed to presume Dr. Ohira not responsible for the alleged conduct;
- Improperly declined to investigate Dr. Ohira's retaliation complaint against Mo, despite its assurance that "BU will take strong disciplinary action in response to any retaliation or intimidation, and will pursue such discipline through the applicable student conduct policy or other disciplinary process and follow the applicable time frames within such policies or processes."

382.    The foregoing violations, individually and in the aggregate, resulted in a process that was neither fair nor impartial, ultimately resulting in an erroneous finding against Plaintiff and the termination of his employment.

383.    As a direct and proximate result of Defendant's material breach of the terms and conditions of the applicable contracts, Dr. Ohira has sustained tremendous damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

## COUNT VI
## Denial of Basic Fairness

384.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

385.    Massachusetts courts have held that school disciplinary hearings must be "conducted with basic fairness." *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 725 (1st Cir. 1983) (citing *Coveney v. President & Trs. of Holy Cross Coll.*, 445 N.E.2d 136, 139 (Mass. 1983)); *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 380 (Mass. 2000).

386.    In the context of a private university's disciplinary process, there are two principal threads to the "fairness" inquiry. The first is *procedural fairness* — that is, whether the process

used to adjudicate the matter was sufficient to provide the accused [individual] a fair and reasonable opportunity to defend himself. The second is *substantive fairness* — that is, even if the procedure was fair, whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. 2016).

387.    Consistent with the implied covenant of good faith and fair dealing, BU's applicable policies and procedures explicitly promise that it will conduct a fair and impartial investigation of all complaints, "with due regard for the rights of all parties" and that "an investigator specifically trained in Title IX Sexual Misconduct investigations and these Procedures will be designated to conduct a prompt, thorough, and fair investigation."

388.    Defendant breached the duty to provide basic fairness because the procedures employed by BU at each step of its complaint resolution process were stacked in favor of the complainants and against Dr. Ohira such that he was deprived of a fair and meaningful opportunity to defend himself.

389.    As described above, the following is a non-exhaustive list of the ways in which Defendant breached the duty to provide basic fairness:

- BU violated the mandate of its Equal Opportunity Policy which, in part: "prohibits discrimination against any individual on the basis of race, color…sex, age, national origin...";
- Failed to conduct a fair and impartial investigation of all complaints, "with due regard for the rights of all parties";
- Failed to treat Dr. Ohira with respect, dignity, and sensitivity as required by the Title IX policies and procedures;
- BU failed to conduct a prompt and thorough investigation of the allegations;
- Did not assure that personnel involved in the complaint resolution process were free of biases;
- Failed to ensure that the hearing panel performed an objective evaluation of all relevant evidence or that credibility determinations were not based on Dr. Ohira's status as a respondent;
- Failed to presume Dr. Ohira not responsible for the alleged conduct;
- Improperly declined to investigate Dr. Ohira's retaliation complaint against Mo, despite its assurance that "BU will take strong disciplinary action in response to

any retaliation or intimidation, and will pursue such discipline through the applicable student conduct policy or other disciplinary process and follow the applicable time frames within such policies or processes."

390.    As a direct and proximate result of the above conduct, Dr. Ohira has sustained tremendous damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff Dr. Ohira demands judgment against Defendant as follows:

(i)    on the first cause of action for discrimination on the basis of sex and gender in violation of M.G.L. c. 151B, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendant's unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction or other equitable relief requiring BU to reinstate Dr. Ohira's employment and requiring BU to destroy all disciplinary records concerning Plaintiff;

(ii)    on the second cause of action for discrimination on the basis of sex or gender in violation of Title VII, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received

but for Defendant's unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)     on the third cause of action for discrimination on the basis of race, color, or national origin in violation of M.G.L. c. 151B, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendant's unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     on the fourth cause of action for discrimination on the basis of race, color, or national origin in violation of Title VII, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for breach of contract, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses,

loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for denial of basic fairness, under contract and common law, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)    a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (a) the outcome and findings made by BU be reversed; (b) Plaintiff's reputation be restored; (c) Plaintiff's disciplinary record be expunged; (d) the record of Plaintiff's termination be removed from his file; and

(viii)    Plaintiff be awarded such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

**Dated:**    **Boston, Massachusetts**
        **April 25, 2025**

                **Respectfully submitted,**

                **NESENOFF & MILTENBERG, LLP**
                **Attorneys for Plaintiff**

                **By:** _____*Tara J. Davis*_____
                **Tara J. Davis, Esq.**
                **101 Federal Street, 19th Floor**
                **Boston, Massachusetts 02110**
                **(617) 209-2188**

**tdavis@nmllplaw.com**

**Andrew T. Miltenberg, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**